819 A.2d 504

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Kenneth MILLER, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 17, 2001.

Re–Submitted June 19, 2002.

Decided Sept. 5, 2002.

Reargument Denied Oct. 25, 2002.

624

626

Joseph J. Marinaro, Philadelphia, for Kenneth Miller, Appellant.

Catherine Marshall, Philadelphia, Robert Graci, Harrisburg, for the Com. of PA, Appellee.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Justice NEWMAN.

Kenneth Miller (Miller) appeals from the Judgment of Sentence of the Court of Common Pleas of Philadelphia County (trial court) that sentenced him to death following two convictions for first-degree murder. After reviewing the claims raised by Miller, we affirm the sentence of death.

### FACTS AND PROCEDURAL HISTORY

As part of our independent review of the record, we summarize the evidence presented at trial. Charles Love, Esq. (Love), represented Miller's uncle, Gregory Miller (Gregory) on various matters, and successfully obtained money for Gregory as the result of a variety of civil claims. Specifically, Love settled one claim against the City of Philadelphia, recovering fifteen thousand dollars ($15,000.00) for Gregory. However, Love could not distribute the entire sum to Gregory because of outstanding support orders and child support arrearages.

On the morning of February 25, 1998, Miller and Marcus Lloyd (Lloyd) met Herbert Blakeney (Blakeney) at Blakeney's house, at which time the three traveled to Gregory's home. During the ensuing conversation, Gregory spoke to the others about robbing Love at his office at 1006 Spruce Street in Philadelphia, and mentioned that anyone present at the office might have to be shot. According to the original plan, as

devised by Gregory and as testified to by Blakeney, Miller was to be the shooter and Lloyd was to tie up the victims while Blakeney acted as a lookout. Gregory gave Miller a handgun and told Blakeney to go to Love's office, get a check for ten thousand dollars ($10,000.00) from the attorney, and give the check to Lloyd; Gregory instructed Lloyd to take the check to the bank and cash it. Gregory did not accompany Miller, Blakeney, and Lloyd to Love's office, but before they left for the office, Gregory told the three that the victims would have to be killed and to "leave no witnesses." (Notes of Testimony (N.T.) September 21, 1999, pp. 27–28).

En route, Miller, Blakeney, and Lloyd took turns carrying the weapon, but Blakeney ended up with it when they reached Love's office. Brian Barry (Barry), a paralegal, opened the office door, whereupon Miller, Blakeney, and Lloyd entered and Blakeney brandished the gun. Blakeney then told Love to write out a check for ten thousand dollars ($10,000.00) while Lloyd tied up Barry. Lloyd departed to cash the check at the bank. Remaining at Love's office, Miller and Blakeney passed the gun back-and-forth to each other.

Lloyd was unable to cash the check because he had insufficient identification, so he returned to Love's office and said to Love, "[y]ou know you is [sic] a dead mother f***er now." (N.T. September 21, 1999, p. 34). Miller then handed the gun to Blakeney and exclaimed that Blakeney "was a b**** ass n***er if [he didn't] kill the mother f***ers." (N.T. September 21, 1999, p. 35). Blakeney then confronted the victims in the back storage room of Love's office and shot each of them in the head. Blakeney took fifteen hundred dollars ($1500.00) from Love's person, and then Miller, Blakeney, and Lloyd fled the scene. The three parted ways temporarily. They later met at Blakeney's house, agreed to split the fifteen hundred dollar ($1500.00) "proceeds" among the three of them, and further agreed to tell Gregory that they did not obtain any money because they could not cash the check.

At approximately 12:00 p.m. on that day, February 25, 1998, one of Love's clients flagged down a police officer at 10th and Spruce Streets and informed the officer that her attorney was

in need of an ambulance. The officer entered the law office and saw the bodies of Love and Barry lying face down on the floor of the storage closet, with gunshot wounds to the back of their heads. Love's desk ledger contained an entry made that day indicating that he had written a check for ten thousand dollars ($10,000.00). The police officer noticed two .38 caliber shell casings on the floor. Both bullets were later recovered from the victims by the medical examiner.

The trial court conducted a jury trial for all three defendants, Miller, Lloyd, and Gregory, which trial lasted from September 16, 1999, until September 29, 1999. Blakeney entered into a negotiated plea agreement, at which time he pled guilty to two counts of murder in the first degree [1] and received two concurrent life sentences, in exchange for his testimony regarding the roles of Miller, Lloyd, Gregory, and himself in the chain of events leading to the deaths of Love and Barry.

The jury convicted Miller of two counts of murder in the first degree, one count of robbery,[2] and one count of criminal conspiracy.[3] Likewise, the jury found Lloyd guilty of two counts of first-degree murder, one count of robbery, and one count of conspiracy. The jury acquitted Gregory of all homicide charges, but convicted him of robbery and related offenses.[4] On September 30 and October 1, 1999, the trial court conducted a penalty phase hearing for the purpose of sentencing Miller to either life imprisonment or death.[5]

At Miller's penalty phase hearing, the Commonwealth sought to introduce evidence of the following aggravating circumstances:

(1) the defendant paid or was paid by another person or had contracted to pay or be paid by another person or had

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 3701.
3. 18 Pa.C.S. § 903(a).
4. The Record does not indicate what sentence Gregory received.
5. In the same penalty hearing, Lloyd was also sentenced to death.

conspired to pay or be paid by another person for the killing of the victim; [6]

(2) in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense; [7]

(3) the victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses; [8] and

(4) the defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.[9]

The trial court sustained Miller's objections to the introduction of evidence of the first two aggravating circumstances but allowed the Commonwealth to proceed on the other two aggravators. Miller's counsel proffered the following two mitigating circumstances: (1) the age of the defendant at the time of the crime; [10] and (2) any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense (the catchall provision).[11]

The sentencing jury found the existence of both aggravating circumstances sought by the Commonwealth and the catchall mitigating circumstance presented by defense counsel. The jury unanimously found that the aggravating circumstances outweighed the mitigating circumstance and imposed sentences of death for both counts of murder in the first degree. The present direct appeal ensued pursuant to 42 Pa.C.S. § 9711(h)(1), which provides that "[a] sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules."

6. 42 Pa.C.S. § 9711(d)(2).
7. 42 Pa.C.S. § 9711(d)(7).
8. 42 Pa.C.S. § 9711(d)(5).
9. 42 Pa.C.S. § 9711(d)(11).
10. 42 Pa.C.S. § 9711(e)(4).
11. 42 Pa.C.S. § 9711(e)(8).

632

## DISCUSSION

### I. Guilt Phase—Sufficiency of the Evidence

 This Court is required to review the sufficiency of the evidence to sustain a conviction for first-degree murder in every case in which the trial court imposes a sentence of death. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *rehearing denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). "When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958, 963 (2001).

 To sustain a first-degree murder conviction, "the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with deliberation." *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 196 (Pa.1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). "Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another." *Id.* "Moreover, we have held that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill." *Weiss,* 776 A.2d at 963 (citing *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90, 95 (1995), *cert. denied,* 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995)). "[T]he Commonwealth can prove the specific intent to kill through circumstantial evidence." *Weiss,* 776 A.2d at 963 (citing *Commonwealth v. Kenneth Brown,* 551 Pa. 465, 711 A.2d 444, 449 (1998)). We have held that where a defendant is not the actual slayer, but instead an accomplice or co-conspirator, to be guilty of first-degree murder, that defendant must also have had the requisite specific intent to kill. *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 876–877 (2000).

18 Pa.C.S. § 306(a) provides that "[a] person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both." Pursuant to 18 Pa.C.S. § 306(b)(3), "[a] person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the offense." The statute defines an accomplice as follows:

(c) **Accomplice defined.**— A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S. § 306(c). The trial court gave the jury the following instruction, which properly informed them that, for Miller to be guilty of first-degree murder, he must have possessed the specific intent to kill both Love and Barry: "[i]n order to find a defendant guilty of murder in the first degree under the theory of 'accomplice liability,' you must find beyond a reasonable doubt that the evidence established that the defendant possessed a specific intent to facilitate the crime of murder even though his conduct did not result in the ultimate criminal offense." (N.T. September 24, 1999, p. 33).

At trial, Blakeney testified that Miller, Lloyd, Gregory, and he discussed plans for robbing Love and shooting Love and his assistant. Blakeney stated that Miller was an active participant in the planning and commission of the crime and, although he was not the person who ultimately shot Love and Barry, he assisted in bringing the murder weapon to the scene of the crime. Blakeney further testified that Miller served as a lookout while Blakeney forced Love to write the check and later made Love answer the phones while Lloyd was at the bank attempting to cash the check. Blakeney told the jury that "[Miller] gave me the gun back and told me I was a b****

ass n\*\*\*er if I don't ... [k]ill the mother f\*\*\*ers." (N.T. September 21, 1999, p. 35). Blakeney admitted that immediately after Miller told him to kill Love and Barry, Blakeney proceeded to shoot each victim once in the head. Even Miller concedes that Blakeney, Lloyd, and he split the fifteen hundred dollars ($1500.00) and agreed to tell Gregory that they were unable to get any money from Love.

The evidence cited above, and all reasonable inferences deducible therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, is clearly sufficient to establish all of the elements of the offense of murder in the first degree beyond a reasonable doubt. From the testimony, the jury could have concluded: (1) that Love and Barry were the victims of an unlawful killing; (2) that Blakeney shot each victim in the back of the head; (3) that Miller was an accomplice of Blakeney, specifically that Miller ultimately pushed Blakeney to carry out Gregory's wishes and aided in the planning and commission of the robbery and murder; (4) that Miller himself possessed the specific intent to kill Love and Barry; and (5) that Miller acted with deliberation. Accordingly, we find, as a matter of law, that the evidence upon which the jury convicted Miller of first-degree murder, was sufficient to sustain both convictions. *See Weiss,* 776 A.2d at 964.

## II. *Guilt Phase—Confrontation Clause*

Miller first argues that the prosecutor, in closing arguments, impermissibly used a statement made by Gregory to corroborate the testimony of Blakeney and implicate Miller. On February 26, 1998, the day after the murders, Philadelphia Police Detective Mangold interviewed Gregory in connection with the crime, believing that Gregory was a client of Love. Gregory stated that he heard Love had been killed and agreed to give a voluntary statement, in which he admitted to seeing Love two days earlier in connection with a civil suit, and that "two other guys" accompanied him to Love's office. (N.T. September 17, 1999, p. 81, Exhibit C–47). During his closing

argument to the jury, the prosecutor used this statement made by Gregory and applied it to Miller as follows:

> Now, what is the corroboration from the statement of [Gregory] and the legal documents. [sic] Well, [Gregory] in his statement to homicide detectives the next day tells you that Mr. Love is my attorney for a civil suit, he says he spoke to Mr. Love the day before the murder. What a coincidence. Two guys with me. What a coincidence. Remember [Blakeney] said that [Miller and Lloyd] had been there before even though according to the detectives who checked the files neither [Miller nor Lloyd] had any prior legal contact with Mr. Love.

(N.T. September 23, 1999, p. 137). The prosecutor later argued that the statement made by Gregory corroborated the testimony of Blakeney. (N.T. September 23, 1999, pp. 143–144).

Specifically, Miller alleges that, pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and its progeny, the inculpatory statement of a non-testifying co-conspirator can only be used against the declarant. Therefore, Miller contends that the introduction of Gregory's statement to implicate him violated his Confrontation Clause right to question a witness against him. We disagree.

In *Bruton*, the United States Supreme Court held that a defendant is deprived of his Confrontation Clause rights when the statement of a non-testifying co-defendant names the defendant as a participant in the crime, even if the jury is instructed to consider that confession only against the code-fendant. The Court reasoned that the Sixth Amendment is violated "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." *Id.* at 135–136, 88 S.Ct. 1620.

In 1987, the U.S. Supreme Court re-examined the issue in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Richardson*, the confession of Marsh's co-defendant was redacted to omit any reference to Marsh.

The Court held that the admission of the confession of Marsh's co-defendant did not violate *Bruton* because it did not expressly implicate Marsh and became incriminating "only when linked with evidence later introduced at trial (the defendant's own testimony)." *Richardson*, 481 U.S. at 208, 107 S.Ct. 1702. Because the redacted confession acquired its incriminating character solely as a result of evidence that later connected Marsh to the confession, the Court reasoned that a jury would be less likely to disregard an instruction to consider the statement only as to the declarant. "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211, 107 S.Ct. 1702. The Court further stated "[w]e express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id.* at 211, n. 5, 107 S.Ct. 1702.

In *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), the U.S. Supreme Court answered this question, holding that replacing the name of the defendant with the word "deleted," an "X," or a blank space in the confession of a co-defendant would violate *Bruton*. However, the *Gray* Court indicated that replacement of a defendant's name with a generic term would not conflict with the Confrontation Clause:

> Consider as an example a portion of the confession before us: The witness who read the confession told the jury that the confession (among other things) said,
>
> 'Question: Who was in the group that beat Stacey?'
>
> 'Answer: Me, deleted, deleted, and a few other guys.'
>
> Why could the witness not, instead, have said:
>
> 'Question: Who was in the group that beat Stacey?'
>
> 'Answer: Me and a few other guys.'

*Gray*, 523 U.S. at 196, 118 S.Ct. 1151. The *Gray* Court distinguished *Richardson* as follows: "*Richardson's* inferences involved statements that did not refer directly to the defen-

dant himself and which became incriminating only when linked with evidence introduced later at trial," while the redacted confession in *Gray* "refer[red] directly to the existence of the nonconfessing defendant." *Gray*, 523 U.S. at 192, 118 S.Ct. 1151. As a general matter, when read together, *Bruton*, *Richardson*, and *Gray* stand for the notion that a statement of a non-testifying co-defendant, provided that the trial court gives a limiting instruction to the jury admonishing them to consider the statement against solely the declarant, will violate the Confrontation Clause only when the jury can tell from the face of the statement to whom it is referring; if the jury must refer to other evidence to determine to whom the statement refers, the Confrontation Clause rights of the defendant are not violated.

In *Commonwealth v. Travers*, 564 Pa. 362, 768 A.2d 845 (2001), Thompson, Travers' co-defendant, admitted to the police his complicity in a murder and expressly made reference to Travers in his statement. The trial court ordered that the phrase "the other man" be substituted for any specific reference to Travers by name. This Court held that such a change, in conjunction with a cautionary instruction, was sufficient to protect Travers' Confrontation Clause rights. We reasoned as follows:

> The rationale employed in *Gray* makes clear that the kind of redaction employed here does not implicate *Bruton* concerns in the same way as a statement that incriminates the defendant on its face, either by actually naming him or by an obvious method of deletion that no less certainly points the finger at him. The redacted statement here neither referred to [Travers] by name (the *Bruton* proscription) nor did it contain an obvious indication of a deletion or an alteration that was the functional equivalent of naming him (the *Gray* proscription). Indeed, use of a neutral pronoun is not an obvious alteration at all. . . .

> The "other man" reference employed here was certainly not the sort of reference which, even were the confession the very first item introduced at trial, obviously referred to the defendant. . . . Instead, as in *Richardson*, the redacted

statement could become incriminating only through inde-
pendent evidence introduced at trial which established the
defendant's complicity and, even then, only if it is assumed
that the jury ignored the court's charge.

*Travers*, 768 A.2d at 851 (internal citations and quotations
omitted).

 *Travers* controls the case *sub judice* on this issue.
Gregory admitted that he saw Love two days earlier in
connection with a civil suit, and that "two other guys" accom-
panied him to Love's law office. As was true of the reference
to the "other man" in *Travers*, the reference to "two other
guys" in the present case was not the sort of reference that,
even were the confession the very first item introduced at
trial, obviously referred to Miller. The statement only be-
came incriminating when linked with Blakeney's testimony,
which was presented later in the trial. The trial court gave
the following cautionary instructions to the jury:

I want to remind you that the purported statements of any
defendant which was given to the police and read to you by
detectives is only evidence in the case involving that particu-
lar defendant. You may not and must not consider the
statement which any of the defendants on trial before you
gave to the police as evidence in the cases involving the
remaining co-defendants.

(N.T. September 23, 1999, pp. 171–172).

I remind you that if you find that a particular defendant
gave a voluntary statement to the police, you may consider
the statement as evidence against only the defendant who
made it. You must not, however, consider the statement as
evidence against any of the co-defendants. You must not
use the statement in any way in the case involving the other
co-defendants.

(N.T. September 24, 1999, p. 9). These were appropriate
cautionary instructions that correctly informed the jury that
they could not use Gregory's statement against Miller. The
law presumes that the jury will follow the instructions of the
court. *Travers*, 768 A.2d at 847 (citing *Commonwealth v.*

*Travaglia,* 541 Pa. 108, 661 A.2d 352 (1995)). Accordingly, we hold that the prosecutor's reference to Gregory's statement did not violate Miller's Sixth Amendment Confrontation Clause rights.

### III. *Guilt Phase—Prosecutor's Remarks Regarding Cooperating Co Conspirator*

Miller next contends that the prosecutor improperly bolstered the testimony of cooperating co-conspirator Blakeney during direct examination and on re-direct. Miller complains of the following testimony of Blakeney elicited by the prosecutor during direct examination:

Question: And is it correct that you expect to receive a sentence in exchange for your **truthful** testimony here today: is that correct?

Answer: Yes.

\* \* \*

Question: So the total sentence you expect to receive in exchange for your **truthful** testimony is double life to run consecutive to one another plus 22 and a half to 45 years incarceration, that's life without parole, is that your understanding?

Answer: Yes.

\* \* \*

Question: I'd ask you to turn to Page 2, sir, Paragraph No. 3. Do you see at the bottom of Paragraph No. 3 it says as part of this agreement, **"Herbert Blakeney will neither attempt to protect any person or entity through omission or false information nor falsely implicate any person or entity."** Is that correct, sir?

Answer: Yes.

Question: No. 4 where it says, "Herbert Blakeney will testify **truthfully,**" is that your understanding of the agreement, sir?

Answer: Yes.

640

(N.T. September 21, 1999, pp. 41–43) (emphasis added). Miller alleges that the prosecutor again impermissibly assured the jury of Blakeney's veracity on re-direct:

Question: Do you remember being in my office about two weeks ago with homicide detectives for a session when we went over what you had said in each of the two statements and what you had said in the Preliminary Hearing under oath on September 3, 1998?

Answer: Yes.

Question: Do you remember being in my office about a week before that as well doing the same thing?

Answer: Yes.

Question: Do you remember what I said was the most important thing to say at all times when you were—

DEFENSE COUNSEL: Objection.

THE COURT: Excuse me, that will be sustained.

(N.T. September 21, 1999, pp. 184–185). Miller argues that, even though the court sustained the objection of defense counsel on re-direct, it failed to give a curative instruction, which left the jury with the impression that the prosecutor vouched for Blakeney's testimony.

Miller relies on *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983), in which the defendant was convicted of a racially-motivated murder. Two witnesses testifying against Tann did so pursuant to plea agreements; the attorneys for both witnesses testified at trial that their clients waived their privilege against self-incrimination and would tell the truth as part of their bargain with the prosecution. This Court reversed the conviction, concluding that the Commonwealth's tactic "invited the inference that, if [Tann] had testified and had told the truth, his testimony would have confirmed his guilt." *Id.* at 328. We reasoned that the Commonwealth cannot:

call to the attention of the jury the fact that a witness, who is associated with the accused in the activity giving rise to the criminal charges, has waived his Fifth Amendment rights against self-incrimination and is taking the witness

stand to *tell the truth*. This tactic has the effect of emphasizing to the jury that the defendant, who is associated with the witness, has the same opportunity to waive his constitutional rights and tell the truth. The defendant is unduly prejudiced by this blatant invitation for the jury to draw an inference from the fact that the witness is foregoing his constitutional right against self-incrimination. This tends to spotlight the accused if he fails to do the same thing and clearly invites an improper prejudicial inference from the jury.

*Id.* (emphasis in original; internal footnote omitted).

In *Commonwealth v. Bricker*, 525 Pa. 362, 581 A.2d 147 (1990), the trial court allowed "actual documents setting forth the terms and conditions of the deals reached between various Governmental authorities and [two cooperating co-conspirators to be] sent out with the jury during their deliberations." *Id.* at 154. One of the plea agreements stated that the co-conspirator would: (1) "provide complete and truthful information to ... the Commonwealth of Pennsylvania ... and testify ... as required;" (2) "provide complete and truthful information concerning any and all illegal activities in which [he] participated;" and (3) "provide complete and truthful information about the deaths" of the victims. *Id.* The agreement further provided that "if at any time it is determined that [the co-conspirator] has not provided complete and truthful information as called for in this agreement ... or has at any time knowingly made a false statement under oath in connection with the terms of this agreement, [he] will be subjecting himself to a prosecution for perjury...." *Id.* The plea agreements were signed by the United States Attorney, the District Attorney for the county, the Attorney General for the Commonwealth, the co-conspirator, and the co-conspirator's lawyer.

This Court reversed Bricker's conviction, finding that the decision of the trial court to allow these documents to go out with the jury was manifestly unreasonable. Writing for the majority, Mr. Justice Cappy reasoned that:

[T]he introduction of the plea agreements served as silent witnesses, causing the same prejudice to [Bricker] as we held to be reversible error in [*Tann*]. With the agreements before them, the jurors could reasonably infer that [Bricker] had the same opportunity as [the cooperating co-conspirators] to cooperate with the investigation . . ., and chose to remain silent. The fact that [Bricker] did not take the stand in his own defense further bolsters his claim that there is a reasonable possibility that this error might have contributed to the verdict.

\* \* \*

It would have been appropriate for the Commonwealth to reveal the existence of the agreements, and the parameters thereof, through the testimony of the witnesses. If they still felt it necessary to enter the documents into evidence they simply could have redacted portions of the agreements to delete the prejudicial aspects, as requested by defense counsel, prior to submission of them to the jury. To allow the jurors to read these unredacted documents at their leisure during deliberations runs afoul of the *Tann* case and the requirements of fundamental fairness.

\* \* \*

[B]y admitting into evidence these agreements that vouch for their credibility, the government was testifying *sub silentio* that *"just this once"* these lowlife witnesses should be believed; that *"during this trial"* they are crowned with the governmental halo of "being on the right side" and are therefore credible. The jury neither cautioned to "look upon the testimony with disfavor" nor to realize that the witnesses may "falsely blame others because of some corrupt and wicked motive", were persuaded to believe that the witnesses were telling the truth because the government's own documents said so. This impermissible vouching for witnesses—especially witnesses of this caliber—offends our sense of decency and our notion of the fundamental fairness inherent in our judicial system.

*Bricker,* 581 A.2d at 154–155. Thus, *Bricker* and *Tann* stand for the proposition that the Commonwealth can reveal the

existence and terms of a plea agreement, but cannot take any further action that would indicate to the jury that the prosecutor vouches for the testimony, such as introducing the written plea agreement for the jury to peruse during deliberation, as in *Bricker*, or putting counsel for the co-conspirators on the stand to vouch for the veracity of their clients, as in *Tann.* Moreover, the trial court must give an instruction to the jury cautioning them to "look upon the testimony with disfavor" and realize that such witnesses may "falsely blame others because of some corrupt and wicked motive." *Bricker*, 581 A.2d at 155.

▬▬▬▬ "In reviewing a claim of improper prosecutorial comments, our scope of review is limited to whether the trial court abused its discretion by ruling that the Commonwealth did not act improperly." *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 638–639 (1995), *cert. denied*, 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996). "Generally, comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Id.* at 639.

▬▬▬ In the case *sub judice*, the prosecutor's use of the word "truthful" in his direct examination of Blakeney is merely an articulation of the parameters of the plea agreement, that Blakeney would provide "truthful" testimony and a guilty plea, in exchange for life imprisonment (as opposed to death). Defense counsel spent most of his time on cross-examination attacking Blakeney's credibility. Thus, on re-direct, the prosecutor simply attempted to rehabilitate the credibility of Blakeney by showing that the cooperating co-conspirator had consistently told the same story. "It is well settled that as long as a prosecutor does not assert his personal opinions, he or she may, within reasonable limits, comment on the credibility of a Commonwealth witness. This is especially true when the credibility of the witness has been previously attacked by the defense." *Simmons*, 662 A.2d at 639 (citing *Commonwealth v. Barren*, 501 Pa. 493, 462 A.2d 233 (1983)). The

prosecutor in the present case did not assert his personal opinions. Accordingly, the concerns articulated by this Court in *Tann* and *Bricker* are not implicated here; in fact, this case conforms to the requisites of the dictum in *Bricker*. Moreover, the court warned the jury that Blakeney might not be telling the truth via the following instruction:

I will now instruct you on the law regarding accomplice testimony.

When a Commonwealth witness was so involved in the crime charged that he was an accomplice, his testimony has to be judged by special precautionary rules. Experience shows that an accomplice when caught will often try to place the blame falsely on someone else. He might testify falsely in the hope of obtaining favorable treatment or for **some corrupt or wicked motive.** On the other hand, an accomplice may be a perfectly truthful witness. The special rules that I shall give you are meant to help you distinguish between truthful and false accomplice testimony.

An accomplice may be defined as a person who knowingly and voluntarily cooperates with or aids another in the commission of a crime. In view of the evidence of Mr. Herbert Blakeney's criminal involvement and convictions for the murders and robbery of Mr. Charles Love and Mr. Brian Barry, you must regard him as an accomplice in those crimes and apply the special rules to his testimony.

These are the special rules that apply to accomplice testimony: Experience shows that **after being caught in the commission of a crime a person may falsely blame others because of some corrupt and wicked motive.** On the other hand sometimes such a person may tell the truth about how he and others committed the crime together. In deciding whether or not to believe Herbert Blakeney, you are to be guided by the following principles which apply specially to his testimony: First, **the testimony of Herbert Blakeney should be looked upon with disfavor as coming from corrupt and polluted source;** second, you should closely and separately examine the testimony of Herbert Blakeney and accept his testimony with caution and care;

third, you should consider separately whether his testimony is supported in whole or in part by other evidence aside from his own testimony, for if it is supported by independent evidence, it is more dependable.

(N.T. September 24, 1999, pp. 18–20) (emphasis added). As we have already noted, the law presumes that the jury will follow the instructions of the court. *Commonwealth v. Travers, supra*, 768 A.2d at 847. Therefore, we hold that the questions asked by the prosecutor of Blakeney, during direct examination and on re-direct, did not impermissibly bolster the latter's testimony and did not "run afoul of the ... requirements of fundamental fairness." [12] *Bricker*, 581 A.2d at 155.

### IV. *Penalty Phase—Ineffective Assistance of Counsel*

Finally, Miller asserts that his trial counsel was ineffective for failing to submit to the jury three additional mitigating factors: (1) that he was under the influence of extreme mental or emotional disturbance; [13] (2) that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; [14] and (3) that he acted under extreme duress or the substantial domination of another person.[15] The Commonwealth counters that trial counsel presented evidence of these mitigating circumstances and did not submit the actual mitigators to the jury on the sentencing verdict slip as a matter of trial strategy.

To prove ineffectiveness of trial counsel, Miller must prove that: "(1) the underlying argument has merit; (2) counsel had no reasonable strategic basis for his action or

---

**12.** Miller also contends that trial counsel was ineffective for failing to object to the prosecutor's questions during the direct testimony of Blakeney. We have concluded that the underlying argument has no merit and counsel will not be deemed ineffective for failing to raise a claim that has no merit. *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649, 652 (2001). Therefore, we will not address the ineffectiveness claim.

**13.** 42 Pa.C.S. § 9711(e)(2).

**14.** 42 Pa.C.S. § 9711(e)(3).

**15.** 42 Pa.C.S. § 9711(e)(5).

inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649, 652 (2001). "Counsel is presumed to have been effective and the defendant has the burden of proving otherwise." *Id.* "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Howard*, 553 Pa. 266, 719 A.2d 233, 237 (1998). "Nor can a claim of ineffective assistance generally succeed through comparing, by hindsight, the trial strategy employed with alternatives not pursued." *Id.* "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.*

Miller's trial counsel presented significant evidence of Miller's mental health and emotional disturbance. Miller was raised without a father and helped raise his five disabled siblings. (N.T. September 30, 1999, pp. 57–60, 62, 65, 68). He became depressed and withdrawn at age fourteen. (N.T. September 30, 1999, pp. 60–62, 66–69). Doctors and counselors at various institutions for mental health problems treated Miller and he even attempted suicide twice. (N.T. September 30, 1999, pp. 61–66). He took Prozac and other medications for manic depression (N.T. September 30, 1999, pp. 64, 66–68). Miller had only been out of his latest mental health institution for three months before the murders. (N.T. September 30, 1999, p. 68). Both Miller's mother and his stepfather testified that Gregory was a bad influence and had a negative impact on Miller. (N.T. September 30, 1999, pp. 69–71, 74–77).

Miller relies on the plurality opinion in *Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221 (1996), *cert. denied*, 519 U.S. 1153, 117 S.Ct. 1090, 137 L.Ed.2d 223 (1997), *rehearing denied*, 520 U.S. 1183, 117 S.Ct. 1464, 137 L.Ed.2d 568 (1997), in which this Court held that "where counsel is informed that his client has suffered some mental problems that may provide

evidence of mitigation in the penalty phase, counsel is ineffective if he fails to pursue such evidence." *Id.* at 1234. In *Smith,* defense counsel pursued two mitigating factors: age and remorse. While the record indicated that the defendant had some mental and emotional problems, defense counsel failed to present any of this evidence during the penalty phase and failed to seek mental state as a mitigating circumstance. Nevertheless, during their deliberations, the jury asked the court if they could consider the defendant's mental health as a mitigating circumstance, which the court permitted. The jury found the defendant's remorse and his mental state as mitigating circumstances. The plurality opinion concluded that trial counsel was ineffective for failing to present evidence of mental state because, if admissible evidence of mental problems existed, "had the jury heard about it, [they] might have come to a different conclusion, i.e., life in prison instead of death." *Id.*

As the Commonwealth contends, Miller's reliance on *Smith* is misplaced. Unlike defense counsel in *Smith,* counsel for Miller pursued evidence of his mental state during the penalty phase. Therefore, the crux of Miller's argument is that he suffered prejudice because his counsel presented evidence of mental state under the catchall mitigating circumstance, rather than pursuant to the mental state mitigating circumstance. It is well settled that the weighing of mitigating circumstances is a qualitative and not quantitative procedure. *Commonwealth v. Dennis Miller,* 555 Pa. 354, 724 A.2d 895 (1999), *cert. denied,* 528 U.S. 903, 120 S.Ct. 242, 145 L.Ed.2d 204 (1999); *see also Commonwealth v. John Wesley Brown,* 538 Pa. 410, 648 A.2d 1177, 1186 (1994) ("balancing aggravating against mitigating circumstances is not a quantitative process—that is, if more aggravating than mitigating circumstances are found, the jury is not required to impose a death sentence; likewise, if more mitigating than aggravating circumstances are found, the jury is not necessarily precluded from imposing a death sentence"). Miller cannot demonstrate that, had the jury characterized the evidence of his mental state pursuant to the mental state mitigating circumstance

rather than the catchall mitigating circumstance, they would have afforded it more weight and been swayed to render a sentence of life imprisonment instead of death. *See also Commonwealth v. Holland,* 556 Pa. 175, 727 A.2d 563, 567 (1999) ("[b]y not specifically tying his argument to one particular [mitigating factor], counsel encouraged a greater range of favorable responses ...."). Accordingly, we hold that trial counsel was not ineffective when he submitted evidence of Miller's mental state during the penalty phase, even though he did not submit mental state as a mitigating circumstance pursuant to 42 Pa.C.S. § 9711(e)(2) and (e)(3).

Miller further alleges that his trial counsel should have obtained records and expert testimony regarding Miller's mental health and should have requested a psychological examination. However, Miller has not indicated how his counsel's failure to present more evidence of his mental state prejudiced Miller. In fact, in *Commonwealth v. Christy,* 540 Pa. 192, 656 A.2d 877 (1995), *cert. denied,* 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995), we held that presentation of in-depth evidence of a defendant's psychological makeup during the sentencing phase of a capital murder prosecution could have a negative impact on the jury, because it could portray the defendant as a dangerous murderer who could kill again. A strategy of offering expert testimony of mental state on top of other evidence in that regard would not necessarily have been favorably interpreted by the jury and, therefore, defense counsel's failure to present such evidence cannot be said to have no reasonable strategic basis. Accordingly, this claim lacks merit.

Miller's final contention is that his trial counsel was ineffective for failing to introduce evidence that he acted under duress or the substantial domination of Gregory. However, the evidence of record completely belies this argument because Miller, Lloyd, and Blakeney divided the fifteen hundred-dollar proceeds of the robbery amongst themselves, agreeing to tell Gregory that they had obtained no money. Accordingly, this contention is without merit, and counsel will

not be deemed ineffective for failing to proceed on a theory without merit.

## CONCLUSION

We conclude that none of the claims of error raised by Miller warrant relief. There was sufficient evidence to support the aggravating circumstances found by the jury in imposing the death penalty.[16] After a thorough review of the record, we have determined that the sentences of death were not the product of passion, prejudice, or any other factor. We affirm the sentences of death imposed upon Kenneth Miller. Pursuant to 42 Pa.C.S. § 9711(i), we direct the Prothonotary of the Supreme Court of Pennsylvania to transmit, within ninety days, the complete record of this case to the Governor of Pennsylvania.

Chief Justice ZAPPALA files a dissenting opinion.

Justice NIGRO files a dissenting opinion in which Chief Justice ZAPPALA joins in part.

Justice SAYLOR files a concurring and dissenting opinion in which Chief Justice ZAPPALA joins in part.

Chief Justice ZAPPALA dissenting.

I join Justice Nigro's dissenting opinion that the Appellant is entitled to a new trial because the prosecution improperly bolstered and vouched for the credibility of Blakeney. I also join Justice Saylor's concurring and dissenting opinion as it relates to the remaining issues.

Justice NIGRO dissenting.

I cannot agree with the majority's conclusion that when questioning co-conspirator Herbert Blakeney, the prosecutor merely articulated the existence and parameters of Blakeney's plea agreement with the Commonwealth. In my view, the prosecutor improperly bolstered and vouched for the credibility of Blakeney, and in doing so, ran "afoul of . . . the require-

16. *See* 42 Pa.C.S. § 9711(h)(4).

ments of fundamental fairness." *See Commonwealth v. Bricker*, 525 Pa. 362, 581 A.2d 147, 155 (1990). Accordingly, I must respectfully dissent.

The Commonwealth cannot conceal the existence of a promise or an agreement to recommend a specific sentence or leniency for a crucial prosecution witness. *See Commonwealth v. Hallowell*, 477 Pa. 232, 383 A.2d 909, 911 (1978); *see also Commonwealth v. Porreca*, 528 Pa. 46, 595 A.2d 23, 27 n. 2 (1991) (under Pa.R.Crim.P. 590, no plea agreement exists unless and until it is presented to the court). It is entirely appropriate for the Commonwealth to reveal the existence and terms of a plea agreement through the testimony of the witness who entered into the agreement with the prosecution. *Bricker*, 581 A.2d at 155. However, this Court has made clear that the Commonwealth may not take any further action that bolsters the witness's testimony or indicates to the jury that the prosecutor vouches for the truth of the witness's testimony. *See, e.g., id.* at 154–55; *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983).

In *Tann*, the defendant, a participant in a violent racial confrontation, was tried for murder. The Commonwealth called two participants in the violence, Joseph Patterson and Keith Hill, to testify against Tann. Patterson and Hill had each entered into a plea agreement with the Commonwealth, obtaining leniency in exchange for their testimony. At Tann's trial, the Commonwealth, in addition to Patterson and Hill, also called the attorneys who represented Patterson and Hill to testify about the plea agreements. Patterson's attorney testified that Patterson had been advised of his Fifth Amendment rights, but had agreed to waive his right against self-incrimination and testify at trial. Hill's attorney testified that in exchange for "his [Hill's] testimony, to testify to what he saw on the night in question and *telling the truth* there [would] be no charges of any kind ... brought against him...." *Id.* at 327 (emphasis in original). Tann was subsequently convicted of third-degree murder.

On appeal, this Court found that defense counsel's failure to object to the attorneys' highly prejudicial and irrelevant testi-

mony regarding their clients' plea agreements could have had no reasonable basis designed to effectuate Tann's interest and therefore, constituted ineffective assistance of counsel. *Id.* at 328. Thus, the Court reversed the judgment of sentence and granted Tann a new trial. *Id.* This conclusion was premised on the principle that where it is likely that the jury will associate a witness with the accused and with the criminal episode giving rise to the charges against the accused, that witness may not be placed on the stand for the purpose of having him exercise his privilege against self-incrimination before the jury. *Id.* at 327–28 (citing *Commonwealth v. Davenport*, 453 Pa. 235, 308 A.2d 85 (1973); *Commonwealth v. DuVal*, 453 Pa. 205, 307 A.2d 229 (1973); *Commonwealth v. Greene*, 445 Pa. 228, 285 A.2d 865 (1971)). Expanding upon that principle, the *Tann* Court stated:

> We believe the same prohibition pertains where the Commonwealth seeks to call to the attention of the jury the fact that a witness, who is associated with the accused in the activity giving rise to the criminal charges, has waived his Fifth Amendment rights against self-incrimination and is taking the witness stand to *tell the truth.* This tactic has the effect of emphasizing to the jury that the defendant, who is associated with the witness, has the same opportunity to waive his constitutional rights and tell the truth. The defendant is unduly prejudiced by this blatant invitation for the jury to draw an inference from the fact that the witness is foregoing his constitutional right against self-incrimination. This tends to spotlight the accused if he fails to do the same thing and clearly invites an improper prejudicial inference from the jury. In the present case, the Commonwealth's use of this unwarranted tactic could only steer the jury to infer that since its witnesses, Patterson and Hill, waived their Fifth Amendment rights and *willingly* gave self-incriminating testimony, Patterson and Hill's testimony was the truth and entirely believable. Added to this is the circumstance of the appellant Tann not taking the witness stand and failing to offer any testimony in his own defense. This invited the inference that, if he had testified and had

told the truth, his testimony would have confirmed his guilt. It was entirely improper for the Commonwealth to invite such prejudicial inferences in the manner employed here.

*Id.* at 328 (emphasis in original) (footnote omitted).

Similarly, in *Bricker*, the Commonwealth's evidence against the defendant included the testimony of two witnesses, Charles Kellington and Charles Rossi, who testified pursuant to plea agreements. At the Commonwealth's request, the trial court allowed the plea agreements to be sent out with the jury during its deliberations. The jury subsequently convicted the defendant of first-degree murder, and he was sentenced to death. Relying on *Tann*, this Court determined on appeal that the trial court committed reversible error in sending the agreements out with the jury. In reversing the conviction, we noted that the language in the plea agreements obligated Rossi and Kellington to tell the truth, and that the signatures of law enforcement officials on the documents that formalized the agreements "placed the imprimatur of their offices as support for the proposition that Rossi and Kellington were *telling the truth.*" *Bricker*, 581 A.2d at 154 (emphasis in original). We further observed that "by admitting into evidence these agreements that vouch for their credibility, the government was testifying *sub silentio* that *'just this once'* these lowlife witnesses should be believed; that *'during this trial'* they are crowned with the governmental halo of *'being on the right side'* and are therefore credible." *Id.* at 155 (emphasis in original). The plea agreements, the Court explained, in effect served as "silent witnesses" from which the jury could reasonably infer that the defendant had the same opportunity as Rossi and Kellington to cooperate, yet chose to remain silent. *Id.* at 154–155. Based on this reasoning, we concluded that it was "beyond question that permitting the prosecution to send these documents out with the jury during deliberations impermissibly bolstered the credibility of Charles Rossi and Charles Kellington." *Id.* We warned that such "impermissible vouching for witnesses—especially witnesses of this caliber—offends our sense of decency and our

notion of the fundamental fairness inherent in our judicial system." *Id.* at 155.

This Court recently addressed a similar claim in *Commonwealth v. DeJesus*, 567 Pa. 415, 787 A.2d 394 (2001), where the defendant argued that the prosecutor improperly bolstered and vouched for the testimony of a witness who entered into a plea agreement with the Commonwealth. In *DeJesus*, the defendant and several cohorts were arrested, charged and tried jointly for two murders. Following the arrests, one of the men pled guilty and testified for the Commonwealth at trial. Prior to trial, DeJesus joined in a motion in limine to bar the Commonwealth from asking the witness whether one of the conditions of his plea agreement was to "testify truthfully." The trial court granted the motion as to the witness's direct testimony, but allowed for the possibility of an appropriate inquiry in that regard on redirect.[1] When the witness was testifying on direct that he had pled guilty, the prosecutor asked him whether "[i]n return for [your] deal, did you have to testify truthfully in this case?" *Id.* at 411 (quoting N.T., 7/28/99, at 137). The question, however, went unanswered because the trial court sustained defense counsel's objection.[2] Writing for the majority, Mr. Justice Cappy rejected the defendant's claim, explaining that:

> While it is clear that the question violated the trial court's ruling on the motion in limine, we cannot agree with [the defendant] that it rose to the bolstering that we have denounced. In our view, this one question from the prosecutor to [the witness] served neither to place the Common-

---

1. The motion in limine and the trial court's ruling also applied to a second prosecution witness who did not participate in the murders, but who entered into a plea agreement with the Commonwealth in a separate case in exchange for his testimony against DeJesus.

2. The trial court also sustained defense counsel's objection to the following question asked of the second prosecution witness: "Did you tell the police at the time the whole truth about what you knew?" *DeJesus*, 787 A.2d at 411 (quoting N.T., 7/28/99, at 44). In addition to sustaining the objection based on the phrasing of the question, the trial court instructed the jury that questions are not evidence and to ignore any matter to which an objection was sustained. *Id* at 411 n. 18.

wealth's official sanction on his credibility nor cloak him with the Commonwealth's authority.

*Id.* (citing *Bricker*, 581 A.2d at 154).

In the instant case, Appellant claims that the prosecutor employed questioning on direct and redirect examination that improperly bolstered the testimony of Blakeney. According to Appellant, the following segment of testimony from the prosecutor's direct examination of Blakeney shows that the prosecutor used his own opinion, the prestige of his office, and the opinion of Blakeney's attorney to vouch for the truth of Blakeney's testimony:

Q [Prosecutor]: Is that a copy of the Plea Agreement that you signed with the Commonwealth of Pennsylvania, you, your attorney, me, and the Chief of the Homicide Unit back on July 16th, 1998?

A [Blakeney]: Yes

\* \* \*

Q: And is it correct that you expect to receive a sentence in exchange for *your truthful testimony here today;* is that correct?

A: Yes.

\* \* \*

Q: So the total sentence you expect to receive in exchange for your *truthful testimony* is double life to run consecutive to one another plus 22 and a half to 45 years incarceration, that's life without parole, is that your understanding?

A: Yes.

Q: The agreement that the Commonwealth made with you in exchange for *your truthful testimony at this hearing* and at all other hearings was that we would not seek the death penalty; is that correct?

A: Yes.

Q: I'd ask you to turn to Page 2, sir, Paragraph No. 3. Do you see at the bottom of Paragraph No. 3 it says as part of this agreement, Herbert Blakeney *will neither attempt to protect any person or entity through omission or false*

*information nor falsely implicate any person or entity.* Is that correct, sir?

A: Yes.

Q: No. 4 where it says, Herbert Blakeney *will testify truthfully,* is that your understanding of the agreement, sir?

A: Yes, sir.

[Prosecutor]: At this time I have a statement which has been marked for purposes of identification as C 55. Counsel has a copy. May it be shown to the witness, please?

BY [Prosecutor]:

Q: Sir, what has been marked as C–55 is a true and correct copy of the statement you gave on July 7th, 1998, to homicide Detective David Barber; is that correct?

A: Yes.

Q: And when you gave that statement you were in the District Attorney's Office with your attorney Charles P. Mirarchi; is that correct?

A: Yes.

Q: And after you completed the statement you had a chance with your attorney to review all the pages of the statement and your attorney read the pages to you; is that correct?

A: Yes.

(N.T., 9/21/99, at 41–43) (emphasis added). The prosecutor's questioning of Blakeney continued on redirect examination as follows:

Q: So is this statement true and correct with the exception of if you turn to Page 4, defense counsel asked you about the end of that answer about the order of at what point you went shopping [after the murders], other than that, is the statement completely true?

A: Yes.

Q: Do you remember being in my office about two weeks ago with homicide detectives for a session when we went over what you had said in each of the two statements and

what you had said in the Preliminary Hearing under oath on September 3rd, 1998?

A: Yes.

Q: Do you remember being in my office about a week before that as well doing the same thing?

A: Yes.

Q: Do you remember what I said was the most important thing to say at all times when you were—

MR. MOORE [Appellant's counsel]: Objection.

MR. LAMENDOLA [Co-defendant Marcus Lloyd's counsel]: Objection.

THE COURT: Excuse me, that will be sustained.

(N.T., 9/21/99, at 184–185).

Based on this questioning, Appellant alleges that the prosecutor impermissibly assured the jury of Blakeney's veracity and the truthfulness of his testimony.[3] Appellant further complains that even though the court sustained defense counsel's objection on redirect, the court failed to give a curative instruction, which left the jury with the impression that the prosecutor and the investigating detectives vouched for the credibility of Blakeney's testimony.

In rejecting these arguments, the majority concludes that "the prosecutor's use of the word 'truthful' in his direct examination of Blakeney [was] merely an articulation of the parameters of the plea agreement." (Maj. Op., at 515). The majority also finds that the prosecutor simply rehabilitated Blakeney's credibility on redirect examination. *Id.* In addition, apparently suggesting that any possible prejudice to Appellant was nevertheless cured, the majority finds that "the court warned the jury that Blakeney might not be telling the

3. In regards to the direct examination, Appellant argues that trial counsel was ineffective for failing to object to the questioning. To prevail on a claim alleging counsel's ineffectiveness, Appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) he was prejudiced by counsel's ineffectiveness. *See Commonwealth v. Wallace,* 555 Pa. 397, 724 A.2d 916, 921 (1999).

truth" by instructing the jury on the law regarding accomplice testimony. *Id.* at 515–16. Thus, the majority concludes that the prosecutor's questioning did not impermissibly bolster Blakeney's testimony and did not violate the requirements of fundamental fairness. I disagree.

The record in the instant case plainly shows that the questioning in the instant case, unlike the questioning deemed permissible in *DeJesus*, involved far more than a single question, with the prosecutor repeatedly emphasizing the truthfulness of Blakeney's testimony before the jury. By asserting his personal opinion that Blakeney was telling the truth to the jury, the prosecutor clearly placed his stamp of approval, and the accompanying authority of his office, upon Blakeney's testimony.[4] Moreover, through the questions he chose, the prosecutor invited the jury, in direct contradiction to this Court's pronouncement in *Tann*, to draw improper inferences about Appellant's decision not to testify in his own defense. *See Tann*, 459 A.2d at 328 (improper for Commonwealth to invite prejudicial inferences in situations where an accomplice witness waives his Fifth Amendment rights and takes the stand to testify and the defendant fails to testify in his defense). In my mind, this line of questioning went far beyond merely disclosing the existence and parameters of the plea agreement, and instead improperly vouched for Blakeney's credibility and in doing so, impermissibly bestowed upon Blakeney the "governmental halo of 'being on the right side.'" *See Bricker*, 581 A.2d at 155.[5]

**4.** *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government").

**5.** I believe Appellant has satisfied the burden of demonstrating that counsel was ineffective for failing to object to the prosecutor's questioning on direct examination. *See Wallace*, 724 A.2d at 921. Based on the record and the above discussion, it is clear to me that Appellant's claim that his counsel was ineffective for failing to object to the prosecutor's questioning of Blakeney on direct examination is of arguable merit. Furthermore, the course chosen by trial counsel to stand by and permit, without objection, the prosecutor's improper bolstering and vouching of Blakeney's accomplice testimony could have no reasonable basis designed to effectuate Appellant's interest. *See Tann*, 459 A.2d at 328. Finally, as the prosecutor was vouching for the truthfulness of the

The majority nonetheless apparently concludes that any prejudice caused by the prosecutor's vouching for and bolstering of Blakeney's credibility was remedied by the trial court's corrupt source charge. Again, I cannot agree.

The purpose of a corrupt source charge is to warn the jury, when an accomplice implicates the defendant, that an accomplice is a corrupt and polluted source whose testimony must be received with caution. *See Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1181 (1999). The rationale behind a corrupt source charge lies in the recognition that an accomplice, out of a reasonable expectation of leniency, has an interest in inculpating others. *Commonwealth v. Thomas,* 479 Pa. 34, 387 A.2d 820, 822 (1978). However, a corrupt source instruction does not in any way address the Commonwealth's bolstering of that same witness, such as that which occurred here during the prosecutor's questioning of Blakeney. Thus, it is difficult to see, as the majority suggests, how the corrupt source charge given in the instant case managed to cure the prejudice created by the prosecutor's improper questioning of Blakeney. In fact, without a curative instruction specifically addressed to the prosecutor's bolstering of Blakeney's testimony, the corrupt source charge was, at the very least, diluted in meaning by the fact that the jury remained free to consider the prosecutor's assurances that Blakeney's testimony was truthful, and therefore by implication, not suspect or corrupt.[6]

principal witness against Appellant, whose testimony was critical to a conviction by the Commonwealth, counsel's failure to act was highly prejudicial to Appellant.

6. I would note that the trial court conducted a lengthy and thorough charge of the jury, encompassing more than fifty pages of the trial transcript. (N.T., 9/24/99, at 7–62). In addition to the corrupt source instruction, the jury charge included, *inter alia,* instructions regarding the credibility of witnesses in general, an instruction that statements made by counsel are not evidence and instructions regarding the arguments of counsel. (N.T., 9/24/99, at 14, 21, 52–54). However, in my view, those general charges were not sufficient to remedy any and all error in the direct examination and testimony of Blakeney. Rather, as noted above, a proper cautionary instruction would have specifically addressed the prosecutor's bolstering and vouching in the context of questioning Blakeney.

Given the prosecutor's improper questioning and the absence of an appropriate curative instruction, the prejudicial effect on Appellant's right to a fair trial was, in my view, overwhelming. As such, I disagree with the majority's conclusion that the prosecutor's questioning did not impermissibly bolster Blakeney's testimony and did not violate the requirements of fundamental fairness. Accordingly, I would award Appellant a new trial.

Although I believe Appellant is entitled to a new trial, I nonetheless feel compelled to address the application of the aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(5)("(d)(5) aggravating circumstance"), which applies where the Commonwealth proves beyond a reasonable doubt that "[t]he victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses," 42 Pa.C.S. § 9711(d)(5), to the instant case. While I agree with the majority's conclusion that the Commonwealth presented sufficient evidence to support the finding of this aggravator under this Court's precedent, I write separately only to express my view that the limits of what is minimally necessary to prove the (d)(5) aggravator has been reached in this case.

This Court explored the parameters of the (d)(5) aggravating circumstance in *Commonwealth v. Crawley,* 514 Pa. 539, 526 A.2d 334, 345 (1987), holding that in order to sustain a finding of the (d)(5) aggravator, evidence must be introduced to establish that the victim was a prosecution witness who was killed to prevent his testimony in a *pending* criminal proceeding. Writing for the majority, Mr. Justice, now Chief Justice, Zappala explained that:

The legislature clearly intended that the Commonwealth bear the burden of establishing (1) that the victim was a prosecution witness to a murder or other felony, and (2) that the victim was killed for the purpose of preventing the testimony in a grand jury or criminal proceeding involving the offense.

> We hold that under § 9711(d)(5), evidence must be introduced to prove that the victim was a prosecution witness who was killed to prevent his testimony in a *pending* grand jury or criminal proceeding. The burden of the Commonwealth will not be met by simply showing that an individual who witnessed a murder or other felony committed by a defendant was also killed by the defendant.

*Id.* (emphasis added). Justice Zappala stated that to hold otherwise would distort the statutory language of (d)(5), which this Court had previously found expressed "the obvious intention of the drafters to address the frontal assault upon the criminal justice system of this Commonwealth" represented by crimes involving the fully formed intent, prior to the event, to kill a prosecution witness.[7] *Id.* (citation omitted). *Accord Commonwealth v. Caldwell,* 516 Pa. 441, 532 A.2d 813, 816 (1987) (insufficient evidence to support (d)(5) aggravating circumstance because no criminal proceeding involving an offense to which either of the victims was a prosecution witness was pending at the time the murders were committed, even though defendant confessed that he killed the victims out of concern that they would later identify him).

Subsequently, however, this Court modified the rule announced in *Crawley* and expanded the reach of the (d)(5) aggravating circumstance. In *Commonwealth v. Appel,* 517 Pa. 529, 539 A.2d 780 (1988), the defendant decided to rob a bank and devised a plan to ensure that all persons who might be in the bank at the time of the robbery could be executed before an alarm could be pressed. It was also crucial to the defendant's plan that no eyewitnesses survive. In attempting to carry out this plan, while robbing the bank, the defendant and his accomplice shot all five people who were present, killing three of them and seriously wounding the other two. On appeal, this Court affirmed the trial court's determination that the (d)(5) aggravating circumstance applied because the victims were killed for the purpose of preventing their testimony against the defendant in the criminal proceedings involv-

7. In so concluding, the Court specifically rejected the Commonwealth's attempt to expand the application of (d)(5) not only to a prosecution witness, but also to *any* witness to a murder or felony.

ing the bank robbery. *Id.* at 783–84. The Court in *Appel* explained that the killing of a *potential* Commonwealth witness results in the same frontal assault upon the criminal justice system as a witness in a *pending* criminal proceeding, and therefore, concluded that the existence of the (d)(5) aggravating circumstance may be found where the killing results from the intention to eliminate a potential witness, if such facts can be established by *direct* evidence. *Id.* at 784 n. 2. Based on that interpretation of (d)(5), the *Appel* Court held that the defendant's admission that he tried to kill all of the people in the bank so that there would be no potential witnesses against him constituted sufficient direct evidence to establish that aggravating factor. *Id.* at 783–84, 784 n. 2. *Accord Commonwealth v. Strong,* 563 A.2d 479, 485 (Pa.1989) (sufficient evidence of (d)(5) where defendant robbed victim and killed him to prevent him from reporting the robbery, stating he was "tired of leaving witnesses behind").

Subsequently, in *Commonwealth v. Daniels,* 537 Pa. 464, 644 A.2d 1175 (1994), this Court summarized its interpretation of (d)(5) as follows:

> A finding of the existence of the aggravating circumstance set forth in § 9711(d)(5) requires proof that the victim was killed to prevent his testimony in a pending grand jury or criminal proceeding. The existence of this particular aggravating circumstance may be found, *absent a pending criminal proceeding,* only where the facts establish by direct, rather than circumstantial evidence, that the killing resulted from the intention to eliminate a potential witness. This burden will not be met by simply showing that an individual who witnessed a murder or other felony committed by a defendant was also killed by the defendant.

*Id.* at 1179 (emphasis added) (citations omitted).[8]

In the instant case, although the victims were not witnesses against Appellant in a pending criminal action, the Commonwealth did present evidence that the victims were killed because they were potential witnesses. Accordingly, based on

---

8. In *Daniels,* the defendant participated in a scheme to kidnap and hold for ransom a sixteen-year-old boy. At trial, the Commonwealth elicited testimony from the defendant that he and one of his cohorts had

this Court's case law, I agree with the majority that there was sufficient evidence to support the jury's finding of the (d)(5) aggravating circumstance here. However, in my view, this case represents the outermost boundary of when the (d)(5) aggravating circumstance can justifiably be applied.

The only reason that the Commonwealth could have properly asserted the applicability of the (d)(5) aggravator in the instant case was the conspiracy link between Appellant and his uncle and co-conspirator, Gregory Miller. At trial, there was no direct evidence presented to show that *Appellant* intended to kill the victims in order to prevent their testimony against him in a criminal proceeding. Rather, co-conspirator Blakeney testified that Gregory Miller indicated that the victims might have to be killed because the robbery would be traced back to him.[9] (N.T., 9/21/99, at 27–28, 180–82). Thus, the

discussed the need to kill the boy because he knew where they lived and, if allowed to go free, would implicate them in the kidnapping. This Court concluded that the direct evidence introduced by the Commonwealth supported the jury's finding that the defendant was motivated to kill the boy in order to prevent him from testifying in a potential criminal proceeding.

See also *Commonwealth v. Fisher*, 559 Pa. 558, 741 A.2d 1234, 1238–40 (2000) ((d)(5) aggravating circumstance found where Commonwealth presented direct evidence that the victim was killed in retaliation for her cooperation with police in a murder investigation); *Commonwealth v. Romero*, 555 Pa. 4, 722 A.2d 1014, 1021 (1999) (affirming appellant's death sentence, in case where defendant and three cohorts devised a plan to rob and murder the defendant's landlord, on the basis that the evidence supported the aggravating circumstance that the defendant had a significant history of violent felony convictions, 42 Pa.C.S. § 9711(d)(9), but also noting that the other three aggravating factors found by the jury, including (d)(5), were supported by the evidence); *Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418, 421, 425 (1997) (sufficient evidence of (d)(5) aggravating circumstance where direct evidence was presented to show the defendant murdered the victim as reprisal for the victim's cooperation with police in investigating a prior shooting, although there was no pending criminal proceeding); *Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929, 937 (1990) ("The killing of witnesses constitutes a frontal assault upon the criminal justice system ... and, whether the decision to kill is made at an early stage, or later, the assault upon the justice system is the same").

9. Indeed, Blakeney himself presented conflicting testimony regarding his reason for shooting the victims. In addition to testifying that it was

intent required by the (d)(5) aggravating circumstance was established only by transferring it to Appellant via his co-conspirator Gregory Miller, and that intent was established solely through co-conspirator Blakeney's testimony. It seems clear that absent the conspiratorial link between Appellant and Gregory Miller, the (d)(5) aggravating circumstance could not have applied to Appellant. Given this tenuous connection, I believe the evidence presented in the instant case represents the absolute minimum required to establish the (d)(5) aggravating circumstance under this Court's interpretation of that aggravating circumstance.

Justice SAYLOR concurring and dissenting.

I join in the majority's reasoning and disposition of Appellant's claims, save for that involving whether trial counsel rendered ineffective assistance in failing to procure records, arrange a psychological evaluation, and present expert testimony in the penalty phase concerning Appellant's mental health. The majority resolves this issue by noting that counsel presented lay testimony respecting Appellant's mental health history and diagnosis through his mother and concludes that Appellant has not demonstrated how the absence of additional evidence in this regard caused him prejudice. In addition, the majority concludes that such evidence could have had a negative impact on the jury by portraying Appellant as a dangerous murderer who could kill again and, consequently, a reasonable strategic basis existed for counsel's omissions.

While this Court has stated that evidence of certain personality disorders, such as those characterized by sociopathic or impulsive behavior, may be unfavorably viewed by a jury as indicative of future dangerousness, *see Commonwealth v.*

Gregory Miller's intent to eliminate potential witnesses, Blakeney testified that he killed the victims because Appellant insulted his pride and called him a name. (N.T., 9/21/99, at 35–36, 55–60, 180–81). Blakeney testified that after co-defendant Lloyd returned from his unsuccessful attempt to cash Mr. Love's check, Appellant gave the gun to Blakeney and told him he was "a bitch ass nigger" if he didn't "kill the mother fuckers." (N.T., 9/21/99, at 35–36). On cross-examination, Blakeney admitted: "I know what led me to kill two people, I was called a name and I had my pride insulted." (N.T., 9/21/99, at 58).

*Howard*, 553 Pa. 266, 277 n. 5, 719 A.2d 233, 238–39 n. 5 (1998) (collecting cases), the testimony in Appellant's case indicated that he suffered from an extreme mental impairment, namely, manic depression or bipolar disorder.[1] In my view, therefore, Appellant's mental health evidence is distinguishable from those cases relied upon by the majority. Moreover, expert assistance is often critical to the presentation of mental health mitigation evidence in a capital case. *See generally Ake v. Oklahoma*, 470 U.S. 68, 80–81, 105 S.Ct. 1087, 1095, 84 L.Ed.2d 53 (1985); *Holland v. Horn*, 150 F.Supp.2d 706, 752 (E.D.Pa.2001); *Christy v. Horn*, 28 F.Supp.2d 307, 322 (W.D.Pa.1998). In this case, therefore, rather than assuming that trial counsel may have had a strategic or tactical basis for presenting lay as opposed to expert testimony regarding Appellant's psychiatric history and condition, I would remand for an evidentiary hearing.

Chief Justice ZAPPALA joins this concurring and dissenting opinion in part.

---

1. Notably, although Appellant has not submitted a post-conviction affidavit from a psychiatrist supporting this diagnosis, the fact of Appellant's institutional treatment is undisputed and the testimony of Appellant's mother contains indicia of the diagnosis. Were this case to be remanded for a hearing, presumably, Appellant would present expert testimony from a psychiatrist or other mental health professional. Certainly, the raising of this claim on direct appeal absent the presentation of expert testimony would be disturbing, as such omission is likely to be fatal to the effort to obtain relief and arguably may foreclose collateral review of the mitigating circumstances issue under the doctrine of previous litigation.