J-A05026-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| STEVE LEVENGOOD | : | |
| | : | |
| Appellant | : | No. 821 MDA 2021 |

Appeal from the PCRA Order Entered May 19, 2021,
in the Court of Common Pleas of Lebanon County,
Criminal Division at No(s): CP-38-CR-0001566-2016.

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:        **FILED: APRIL 28, 2022**

Steve Levengood appeals from the order denying his first timely petition filed pursuant to the Post Conviction Relief Act ("PCRA").  42 Pa.C.S.A. §§ 9541-46.  We affirm.

The PCRA court detailed the pertinent facts and procedural history of this case:

> Prior to the incident occurring on June 27, 2016, the families of both [Levengood] and Victim were immersed in a hostile relationship.  These hostilities first started when the families began living next door to each other in 2010.  A dispute regarding the shared driveway began these problems and eventually led to further disputes regarding property lines, barking dogs, pet ducks, intrusive video recordings, and the use of a strobe light.  Eventually, both

_____

[*] Former Justice specially assigned to the Superior Court.

families filed complaints against each other and multiple phone calls to police were made.

The Cornwall Police Department suggested mediation as the problems persisted, but these efforts eventually failed. Afterward, [Levengood] installed "No Trespassing" and "Private Property" signs that directly faced Victim's home. Victim and his family responded by attempting to cover these signs with decorative flags. [Levengood] and his family responded by placing even more signs that were elevated and more difficult to cover up.

On the night of June 27, 2016, these ongoing tensions finally resulted in violence. After returning home from work, Victim erected his own no trespassing signs that he installed along the shared property line. As Victim was hammering in the signs, he heard laughing coming from [Levengood's] house. Despite shining a flashlight in the direction of the noise, Victim did not discover its source. At this point, Victim abandoned the sign project and proceeded to park his car for the evening. This included first moving several orange cones that he had placed in the driveway. [Levengood], armed with a flashlight, then approached Victim and engaged him in a heated verbal exchange. Eventually, this exchange became physical when [Levengood] proceeded to shine his flashlight in the eyes of Victim, who responded by swatting the flashlight away from his eyes. After repeating this sequence of actions several times, [Levengood] transferred the flashlight to his non-dominant left hand and proceeded to punch Victim in the jaw. Immediately after receiving the blow to his face, Victim fell backward and struck his head on the asphalt driveway. Despite rendering Victim unconscious, [Levengood] proceeded back to his home without offering any assistance to Victim. [Levengood's] wife, Tracy Levengood, proceeded to call 911, reported the incident, and requested police assistance.

Police Officer Sean McCarrick of the South Lebanon Police Department responded to the scene. After arriving, Officer McCarrick made the decision to request an ambulance and medical assistance for Victim. This decision was based on the officer's observation of Victim's condition, which include incoherency, excessive bleeding from a head injury, and Victim's inability to walk or speak properly. Victim was

transported to Hershey Medical Center where he spent two days in the Intensive Care Unit followed by an additional eight-day stay before he was released. Dr. Justin Chandler, who was charged with the care of Victim, noted that Victim's injuries included a cephalohematoma (a brain bleed), a subarachnoid hemorrhage, and bruising of the brain from the assault. These injuries were all noted as potentially life threatening. Because of these injuries, Victim had to undergo months of therapy to regain his ability to speak and walk properly. Additionally, Victim developed an acute sensitivity to light, which ultimately resulted in Victim losing his job.

Due to a conflict of interest, Chief County Detective Daniel Wright [] eventually took over the investigation, relieving Cornwall Borough Police Department. After interviewing [Levengood] and is wife, reviewing the steps of his investigation, and considering all the evidence relating to the incident, Chief Wright decided to charge [Levengood] with both Aggravated and Simple Assault.

PCRA Court Opinion, 5/19/21, at 2-5.

After a three-day trial, a jury convicted Levengood on both counts. In addition to the facts stated above, the PCRA court summarized the pertinent trial testimony as follows:

Throughout the course of the trial, several witnesses were called to testify about the events that took place on June 27, 2016 and the related investigation into the incident. Chief Wright was called as a witness. He testified that he decided to charge [Levengood] with both aggravated and simple assault after reviewing all the evidence and steps of the investigation. On cross-examination [trial counsel] questioned Chief Wright extensively about alleged holes in the investigation specifically with respect to the legal issue of mens rea for aggravated assault. At some point, the trial court intervened and provided the jury with the standard jury instruction on that particular issue.

- 3 -

The Defense opened its case by presenting character witnesses. In total, twenty-one (21) individuals were called to provide testimony that [Levengood] had a reputation of being a peaceful and law-abiding citizen. After four of these witnesses testified, [the trial court] had the remaining seventeen (17) witnesses stand before the jury while the Commonwealth stipulated that their testimony would provide insight into [Levengood's] good reputation in the community as a peaceful and law[-]abiding citizen. On rebuttal, the Commonwealth offered the testimony of one character witness. This witness, [Officer] Sean McCarrick, had testified earlier in the day as a part of the Commonwealth's case-in-chief since he was the first responding police officer to the scene. However, the Commonwealth had the witness explain to the jury that he was now testifying as a citizen of the Borough of Cornwall, and not as a police officer. He testified that he knew [Levengood] to have a reputation as a violent and non-peaceful person. [Trial counsel] questioned him on cross-examination about his testimony and asked for names of individuals whom he relied upon to form this opinion.

[Levengood] testified on his own behalf. He asserted that Victim was cursing about the Levengood family and this led [Levengood] to approach Victim. [Levengood] alleged that although he may have shined a flashlight in Victim's face, Victim began swinging his arms at [him], which [Levengood] took as an act of aggression. He then explained that he responded by punching Victim in the face, which caused [Victim] to fall backward and strike his head on the paved driveway. When questioned about the obsessive behavior the [Levengoods] displayed toward [Victim's] family, [Levengood] explained that his wife was responsible for the alleged acts of filming, photographing, and logging the daily activity of the [Victim's] family. [Levengood] also testified that the video taken by his wife was not complete and did not accurately capture the full incident.

PCRA Court Opinion, 5/19/21, at 5-6.

On August 23, 2017, the trial court sentenced him to an aggregate term of three to seven years of imprisonment. Levengood appealed to this Court,

and we affirmed his judgment of sentence on April 3, 2018. *Levengood*, 190 A.3d 680 (Pa. Super. 2018) (non-precedential decision). On September 25, 2018, our Supreme Court denied Levengood's petition for allowance of appeal. *Commonwealth v. Levengood*, 194 A.3d 1036 (Pa. 2018).

On September 6, 2019, Levengood filed a counseled PCRA petition. The Commonwealth filed a response on January 8, 2020. The PCRA court held an evidentiary hearing on November 24, 2020. At this hearing, Levengood presented the testimony from trial counsel, as well as from his wife and his daughter. By order entered on May 19, 2021, the PCRA court dismissed Levengood's petition. This appeal followed. Both Levengood and the PCRA court have complied with Pa.R.A.P. 1925.

Levengood raises four issues on appeal:

I. Whether the [PCRA] court erred in denying the PCRA petition were trial counsel provided ineffective assistance of counsel when he failed to object to improper opinion testimony from [Chief Wright] to the effect that he and officials in the District Attorney's Office personally believed that [Levengood] was guilty as charged?

II. Whether the [PCRA] court erred in denying the PCRA petition where trial counsel provided the ineffective assistance of counsel in failing to object and move for a mistrial when the Commonwealth argued in closing that [Levengood] had the burden of calling witnesses to testify on his behalf?

III. Whether the [PCRA] court erred in denying the PCRA petition where trial counsel was ineffective in failing to investigate and call known defense witnesses to testify at trial?

IV. Whether the [PCRA] court erred in denying the PCRA petition where trial counsel was ineffective in failing to object to the Commonwealth's use of a uniformed police officer who had been involved in investigating the case as a rebuttal character witness and where that same witness testified to specific prior bad acts which did not result in a criminal conviction?

Levengood's Brief at 7-8.

This Court's standard of review for an order dismissing a PCRA petition is to ascertain whether the order "is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." *Commonwealth v. Barndt*, 74 A.3d 185, 191-92 (Pa. Super. 2013) (citations omitted).

Levengood's issues challenge the effectiveness of trial counsel. To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." *Id.* This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) the petitioner was prejudiced by counsel's act or omission. *Id.* at 533. A failure to satisfy any prong of the

test for ineffectiveness will require rejection of the claim. ***Commonwealth v. Martin***, 5 A.3d 177, 183 (Pa. 2010).

Here, the PCRA court has authored a thorough and well-reasoned opinion supporting the denial of post-conviction relief. The Honorable Samuel A. Kline has addressed each of Levengood's ineffectiveness claims with proper citation to legal authorities and citation to the certified record. We discern no legal errors in Judge Kline's analysis and/or an abuse of discretion when rejecting Levengood's claims. As such, we adopt Judge Kline's opinion as our own in affirming the order denying Levengood post-conviction relief. ***See*** PCRA Court's Opinion, 5/9/21, at 11-14 (concluding that trial counsel was not ineffective for failing to object to Chief Wright's testimony regarding his decision to charge Levengood with aggravated assault and did not provide his personal opinion of Levengood's guilt); at 14-20 (concluding that Levengood could not prove he was prejudiced by trial counsel's failure to object to prosecutor's closing argument; counsel requested sidebar to insure that trial court's instructions included language that Levengood had no burden of proof and that he was not required to present any evidence); at 20-22 (concluding that given the video evidence introduced at trial, trial counsel's failure to call Levengood's wife and children was reasonable, based on counsel's credible testimony that a joint decision was made not to call them); and 22-27 (concluding that Levengood was not prejudiced by the Commonwealth's

character witness testifying in his police uniform and there was no clear indication that Levengood had engaged in other illegal or criminal behavior).[1]

Order affirmed.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/28/2022

---

[1] The parties are directed to attach Judge Kline's May 19, 2021, opinion to this memorandum in any future appeal.

ENTERED & FILED
CLERK OF COURTS
LEBANON PA

2021 MAY 19 A 9: 25

**IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY
PENNSYLVANIA**

**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA          :

                               :

                               :

         v.                      :

                               : No. CP-38-CR-1566-2016

STEVEN LEVENGOOD          :

OPINION, KLINE, J. May 18, 2021

*FACTS*

On June 27, 2016 Mr. Steven Levengood (hereinafter "Defendant") engaged in a heated confrontation with his neighbor, Mr. Darnell Pemberton (hereinafter "Victim") that ultimately resulted in Defendant punching Victim with such force that it caused Victim to fall backward and hit his head on his paved driveway. The force and manner in which Victim struck his head resulted in Victim suffering a traumatic brain injury. The facts and circumstances leading up to and throughout this incident are as follows.

Prior to the incident occurring on June 27, 2016, the families of both Defendant and Victim were immersed in a hostile relationship. These hostilities first started when the families began living next door to each other in 2010. A dispute regarding the shared driveway began these problems and eventually led to further disputes regarding property lines, barking dogs, pet ducks, intrusive video

2

recordings, and the use of a strobe light. Eventually, both families filed complaints against each other and multiple phone calls to police were made.

The Cornwall Police Department suggested mediation as the problems persisted, but these efforts eventually failed. Afterward, Defendant installed "No Trespassing" and "Private Property" signs that directly faced Victim's home. Victim and his family responded by attempting to cover these signs with decorative flags. Defendant and his family responded by placing even more signs that were elevated and more difficult to cover up.

On the night of June 27, 2016, these ongoing tensions finally resulted in violence. After returning home from work, Victim erected his own no trespassing signs that he installed along the shared property line. As Victim was hammering in the signs, he heard laughing coming from Defendant's house. Despite shining a flashlight in the direction of the noise, Victim did not discover its source. At this point, Victim abandoned the sign project and proceeded to park his car for the evening. This included first moving several orange cones that he had placed in the driveway. Defendant, armed with a flashlight, then approached Victim and engaged him in a heated verbal exchange. Eventually, this exchange became physical when Defendant proceeded to shine his flashlight in the eyes of Victim, who responded by swatting the flashlight away from his eyes. After repeating this sequence of actions several times, Defendant transferred the flashlight to his non-dominant left hand and proceeded to punch Victim in the jaw. Immediately after receiving the blow to his face, Victim fell backward and struck his head on the asphalt driveway. Despite

3

rendering Victim unconscious, Defendant proceeded back to his home without offering any assistance to Victim. Defendant's wife, Tracy Levengood, proceeded to call 911, reported the incident, and requested police assistance.

Police Officer Sean McCarrick of the South Lebanon Police Department responded to the scene. After arriving, Officer McCarrick made the decision to request an ambulance and medical assistance for Victim. This decision was based on the officer's observation of Victim's condition, which included incoherency, excessive bleeding from a head injury, and Victim's inability to walk or speak properly. Victim was transported to Hershey Medical Center where he spent two days in the Intensive Care Unit followed by an additional eight-day stay before he was released. Dr. Justin Chandler, who was charged with the care of Victim, noted that Victim's injuries included a cephalohematoma (a brain bleed), a subarachnoid hemorrhage, and bruising of the brain from the assault. These injuries were all noted as potentially life threatening. Because of these injuries, Victim had to undergo months of therapy to regain his ability to speak and walk properly. Additionally, Victim developed an acute sensitivity to light, which ultimately resulted in Victim losing his job.

Due to a conflict of interest, Chief County Detective Daniel Wright (hereinafter "Chief Wright") eventually took over the investigation, relieving the Cornwall Borough Police Department. After interviewing Defendant and his wife, reviewing the steps of his investigation, and considering all the evidence relating to the incident, Chief Wright decided to charge the Defendant with both Aggravated

4

and Simple Assault. On June 14, 2017, a jury convicted Defendant of one count Aggravated Assault and one count of Simple Assault. On August 23, 2017, this Court imposed an aggregate sentence of three (3) to seven (7) years imprisonment. Defendant then appealed this Court's decision to the Superior Court of Pennsylvania. Following this appeal, the Superior Court affirmed this Court's judgment of sentence on April 3, 2018. On October 24, 2018, the Supreme Court denied Defendant's Petition for Allocatur.

Defendant was represented at trial and on appeal by Attorney Jay Nigrini. Throughout the course of the trial, several witnesses were called to testify about the events that took place on June 27, 2016 and the related investigation into the incident. Chief Wright was called as a witness. He testified that he decided to charge Defendant with both aggravated and simple assault after reviewing all the evidence and steps of the investigation. On cross-examination, Attorney Nigrini questioned Chief Wright extensively about alleged holes in the investigation specifically with respect to the legal issue of mens rea for aggravated assault. At some point, the trial court intervened and provided the jury with the standard jury instruction on that particular issue.

The Defense opened its case by presenting character witnesses. In total, twenty-one (21) individuals were called to provide testimony that Defendant had a reputation of being a peaceful and law-abiding citizen. After four of these witnesses testified, the Court had the remaining seventeen (17) witnesses stand before the jury while the Commonwealth stipulated that their testimony would provide insight

5

into Defendant's good reputation in the community as a peaceful and law abiding citizen. On rebuttal, the Commonwealth offered the testimony of one character witness. This witness, Mr. Sean McCarrick, had testified earlier in the day as a part of the Commonwealth's case-in-chief since he was the first responding police officer to the scene. However, the Commonwealth had the witness explain to the jury that he was now testifying as a citizen of the Borough of Cornwall, and not as a police officer. He testified that he knew Defendant to have a reputation as a violent and non-peaceful person. Attorney Nigrini questioned him on cross-examination about his testimony and asked for names of individuals whom he relied upon to form this opinion.

Defendant testified on his own behalf. He asserted that Victim was cursing about the Levengood family and this led Defendant to approach Victim. Defendant alleged that although he may have shined a flashlight in Victim's face, Victim began swinging his arms at Defendant, which Defendant took as an act of aggression. He then explained that he responded by punching Victim in the face, which caused him to fall backward and strike his head on the paved driveway. When questioned about the obsessive behavior the Levengood's displayed toward the Pemberton family, Defendant explained that his wife was responsible for the alleged acts of filming, photographing, and logging the daily activity of the Pemberton family. Defendant also testified that the video taken by his wife was not complete and did not accurately capture the full incident.

Defendant, now represented by new counsel, filed a Petition for Post-Conviction Collateral Relief on September 6, 2019 and an Amended Petition on December 16, 2019. Defendant alleged in his Petition that trial counsel provided ineffective assistance of counsel in four aspects of his representation of Defendant at trial: (1) Defendant argued that counsel had failed to object and to ask for a mistrial with regard to improper bolstering and "expert" opinion testimony by Chief Wright; (2) that counsel had failed to object and to move for a mistrial on the basis of improper burden shifting that was mentioned during Commonwealth's closing argument; (3) that counsel had failed to call Defendant's wife and minor children as witnesses; and (4) that counsel had failed to object to a uniformed police officer presenting rebuttal evidence to Defendant's character witnesses and inadequately engaged in cross-examination of that witness. The Commonwealth filed its response on January 8, 2020. On February 15, 2020, the Court entered an Order scheduling an evidentiary hearing for March 8, 2020, which was eventually continued to November 24, 2020 due to complications imposed by COVID-19.

At the evidentiary hearing, Defendant presented the testimony of four witnesses: Attorney Nigrini, Tracy Levengood (wife of Defendant), Amber Levengood (child of Defendant), and himself. Attorney Nigrini testified regarding his trial strategy and provided background into his legal career and experience in criminal defense work.

Attorney Nigrini then testified as to the specific issues that Defendant raised in his PCRA. First, Attorney Nigirini explained why he did not object to the

challenged portion of Chief Wright's testimony. He explained that he interpreted the testimony to be an explanation of Chief Wright's reasoning behind the charging decision. He did not believe that Chief Wright offered any legal conclusions, and therefore his testimony did not amount to objectionable bolstering.

Next, he addressed the issue of burden shifting. While he did not object in the middle of the Commonwealth's closing argument, he did request a sidebar and requested that the trial judge give an instruction that made it clear that Defendant had no burden to call any witnesses. The trial judge acknowledged this and explained that such an instruction is a part of the standard charge. For these reasons, Attorney Nigrini explained that he did not object because he felt that the issue had been addressed appropriately through the Court's reading of the jury instructions.

Third, Attorney Nigrini detailed why he did not call Defendant's minor children and wife as witnesses. Before trial, he testified that there was an agreement in place prior to trial that the minor children would not be involved in the case. He explained that he did not wish to subject them to cross-examination, and felt that their testimony would not add anything useful since the incident was captured on video. Moreover, he alleged the video was taken from a similar vantage point from which the children would have also witnessed the incident.

Lastly, Attorney Nigrini testified regarding why he did not object to Officer McCarrick's rebuttal testimony. Although he did offer rebuttal testimony in police uniform, Attorney Nigrini did not see it as an issue. The Commonwealth elicited

8

testimony from the witness which was meant to negate any prejudicial effects stemming from Officer McCarrick's uniform which he wore during both testimonials.

## DISCUSSION

### The Post-Conviction relief Act ("PCRA")

The purpose of the Post Conviction Relief Act (PCRA) is to preclude a "fundamentally unfair conviction" and to allow a process by which a person wrongfully convicted of a crime he did not commit or who is erving an illegal sentence may find relief. *Commonwealth v. Carbone*, 707 A.2d 1145 (Pa. Super. 1998).

> To qualify for relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2); that his claims have not been previously litigated or waived; and that the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel. *Id.* § 9543(a)(3), (a)(4). An issue is previously litigated if "the highest appellate court in which [the petitioner] could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2).

*Com. v. Vandivner*, 130 A.3d 676, 680 (Pa. 2015)

Ineffective assistance of counsel is one of the grounds enumerated in 42 Pa.C.S.A. § 9543(a)(2). Article I, Section 9 of the Pennsylvania Constitution, guarantees an accused the right to counsel in criminal prosecutions. This section provides,

> In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to be confronted with the witnesses against

9

him, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage...

PA Const. Art. 1, §9. The right to counsel includes the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984), citing *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970). The Pennsylvania Supreme Court has ruled, "The petitioner must still show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Com. v. Kimball*, 724 A.2d 326, 333 (Pa. 1999). This requires a three-part test: "(1) that the claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." *Id.* "...[W]here the petitioner has demonstrated that counsel's ineffectiveness has created a reasonable probability that the outcome of the proceedings would have been different, then no reliable adjudication of guilt or innocence could have taken place." *Id.* "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." *Com. v. Busanet*, 817 A.2d 1060, 1066 (Pa. 2002).

When counsel has chosen a particular course of strategy and tactic with a reasonable basis to effectuate the client's interests, counsel's assistance is generally deemed effective. *Com. v. Miller*, 819 A.2d 504 (Pa. 2002). Furthermore, hindsight

comparison of trial strategy with alternatives not employed must conclude that the alternative strategy not employed would have offered a greater potential for success. *Id.* at 517.

With these well-settled standards in mind, this Court is tasked with deciding whether these actions or lack of actions by Attorney Nigrini rose to the level required to prove a claim of ineffective assistance of counsel. Each issue and claim made by Defendant is discussed at length below.

## 1. Failure to object to bolstering and "expert" opinion testimony by Chief Wright.

Defendant first argues that trial counsel was ineffective for failing to object to certain parts of testimony given by Chief Wright. Specifically, Defendant takes issue with a portion of the testimony in which Chief Wright detailed the reasons behind the charging decisions. He claims that parts of the testimony amounted to improper bolstering and therefore Trial Counsel should have objected.

There are two circumstances in which improper bolstering can occur: "(1) When the prosecution places the prestige of the government behind the witness by personal assurances of the witness's veracity; and (2) when the prosecution indicates that information which is not before the jury supports the witness's testimony." *Commonwealth v. Hartley,* 621 A.2d 1023, 1026 (Pa. Super. 1993), *citing Commonwealth v. Reed,* 446 A.2d 311, 314 (1982). Below is the portion of Chief Wright's testimony at issue:

> ADA Hess: Now Chief, ultimately the charging determination was yours and you chose to charge on Aggravated Assault; is that fair?

11

Ch. Wright: I did.

ADA Hess: Why?

Ch. Wright: I chose to file the Aggravated Assault charges based on several reasons: One, was the extent of the injuries. I believe Mr. Pemberton suffered serious bodily injury as a result of the assault. There was also some factors taken into consideration upon reviewing the video. I did not observe an aggressive act by Mr. Pemberton against Mr. Levengood. When you also watched the video too you see Darnell had had a light shined in his eyes several times. It was dark, it was night. And the punch that was thrown was a pretty quick punch. I think based on the circumstances, he was defenseless and took a full punch from a man much heavier than him causing him to fall and hit his head.

(N.T.T., Vol. II, at 168.)

Defense Counsel choose not to object to this particular line of questioning or Chief Wright's responses. At the evidentiary hearing, Attorney Nigrini explained two reasons why he did not object. First, he stated that he did not believe that the testimony was objectionable in the first place. In his opinion, Chief Wright was providing his reasoning for the charging decision. Attorney Nigrini did not believe that Chief Wright was offering improper expert opinion testimony that Defendant was guilty or that he was bolstering the veracity of the Victim's testimony. Second, Attorney Nigrini explained that he choose not to object as a matter of trial strategy. Attorney Nigrini stated that part of his trial strategy was attempting to show to the jury that the Commonwealth rushed to charge Defendant with Aggravated Assault without knowing all the facts. By not objecting during the Commonwealth's direct examination of Chief Wright, Attorney Nigrini preserved the opportunity to cross-examine Chief Wright and further explore his theory that the Commonwealth had charged Defendant with Aggravated Assault without proper investigation.

12

Moreover, the Commonwealth alleges that this particular testimony from Chief Wright was cumulative and did not provide any information not already known by the jury. Chief Wright explained to the jury what transpired between Defendant and Victim and included his rationale for the charging decision. He did not comment on the mens rea of Defendant and did not provide any testimony as to whether he believed the Defendant was guilty of Aggravated Assault.

Given this testimony by Chief Wright and Attorney Nigirini's testimony regarding trial strategy, it was reasonable that defense counsel did not object during the testimony at issue. Chief Wright was testifying as to the reasons why he chose to charge the Defendant in the manner he did. Because testimony about this reasoning was key to the Defense's theory of the case, it was reasonable that Attorney Nigrini would refrain from objecting. In doing so, he preserved the ability to question the witness and explore potential holes that could have aided the defense in disproving the prosecution's case. His testimony did not support the veracity of the victim, and instead only was used to explain the reasoning behind the Commonwealth's charging decision.

Additionally, it was not improper to refrain from objecting because the jury already knew about the injuries sustained by Victim. The testimony regarding Victim's injuries was cumulative because the jury had already been presented with evidence about Victim's injuries and Chief Wright's testimony did not include any facts about the incident which were not already known by the jury. For these reasons, Trial Counsel's decision to refrain from objecting to Chief Wright's

13

testimony was not ineffective assistance of counsel because he had a reasonable strategy that could have potentially aided the defense, Chief Wright never bolstered the testimony of any other witnesses, and was not improper because the facts to which he testified were already known by the jury.

## 2. Failure to object to burden shifting

Defendant next argues that trial counsel was ineffective for failing to object to what he alleges was improper burden shifting on behalf of the Commonwealth. Defendant alleges that trial counsel was ineffective for failing to object "when the Commonwealth argued in its closing that the defense had the burden of calling Mr. Levengood's wife, Tracy Levengood, to testify on his behalf." PCRA Petition, ¶ 40. Additionally, he claims Trial Counsel was ineffective for failing to object when the Commonwealth, on cross-examination of Defendant, repeatedly made remarks about the lack of testimony from Mrs. Levengood. In response, the Commonwealth claims that it never argued in closing or on cross that Defendant had the burden of calling his wife to testify, and instead was offering fair commentary on the credibility of Defendant's testimony and evidence.

In a criminal trial, a defendant has no burden to present evidence or to testify. *Commonwealth v. Smith*, 17 A.3d 873 (Pa. 2011). It is the Commonwealth who has the burden of proving the defendant's guilt and each element of the offenses charged beyond a reasonable doubt. *Commonwealth v. Smith*, 17 A.2d 873 (Pa. 2011). However, if the defendant does choose to testify, the Commonwealth is

14

not prohibited from offering fair commentary on the credibility of the defendant. *Commonwealth v. Paddy*, 800 A.2d 294, 317 (Pa. 2002).

Here, the Commonwealth made remarks during its closing concerning the lack of testimony from Defendant's wife. Specifically, the Commonwealth alleged that during Defendant's testimony he attempted to deflect blame to his wife.

> [Commonwealth]: Let's talk about his wife's testimony. You can't. She didn't testify. Now we have an ability to subpoena witnesses and bring them into Court just as Defense does, and you say that because they called, I believe 21 in total character witnesses. They took that step. And you heard Mr. Levengood testify, my wife did that, my wife recorded that, that was my wife. You would expect then that if his version of events were true, if those threats were made, those comments were made, that Darnell Pemberton swung first, the one person walking the face of this planet that would want to come into Court and stand up and say what happened would be his wife. You expect that. She sat here. She's in the Courthouse right now. She had nothing to say to you from the witness stand. Consider that.

(N.T.T. Vol. III at 28-29).

Defendant argued that these words were an improper attempt by the Commonwealth to shift the burden of calling witnesses onto Defendant. While presenting its case, the Commonwealth had presented evidence at trial to elaborate on the years of bitterness and animosity that was shown between the families. This was partially brought out on the Commonwealth's cross-examination of Defendant by asking about the conduct of his wife and her lack of testimony at trial. Some of these pieces of evidence included logs of when the Pemberton family would let their dogs out, when the Pemberton ducks would quack, videotape footage of the Victim

15

in his backyard, and pictures of signs that Defendant and his family placed in their yard facing the Pemberton family's property.

During cross-examination of Defendant, the Commonwealth questioned Defendant about these acts that no doubt fueled the ongoing feud between the families. Defendant placed the blame for these acts on his wife and tried to minimize his own involvement. In doing so, he attempted to negate the mens rea requirement for a one-punch aggravated assault charge. Evidence of this ongoing feud was utilized by the Commonwealth to demonstrate that the mens rea requirement had been satisfied. Defendant also testified that prior to the incident resulting in Victim's injuries, Victim had yelled and cursed at Defendant first. This claim is inconsistent with the video taken by Defendant's wife. Defendant testified that none of this was captured on video because his wife failed to capture the entirety of the exchange leading up to the assault. This claim however, is inconsistent with the 9/11 recording made by Defendant's wife in which she claimed that she had captured "everything."[1]

These inconsistencies were noted by the Commonwealth on cross examination and in its closing, the Commonwealth chose to comment on them. "In closing arguments, a prosecutor may comment on the evidence and any reasonable inferences arising from the evidence." *Commonwealth v. Arrington*, 86 A.3d 831, 853 (Pa. 2014). However, the Commonwealth is not permitted to comment on a witness's failure to testify and to then shift the burden to make it appear that the

---

[1] The jury was presented with the audio recording of Mrs. Levengood's 9/11 call made on the night of the assault.

16

Defendant had the burden to call any witnesses. The Commonwealth clearly teetered on the line when it came to these comments. Upon reading them, it does appear that these comments were questionable. However, the question here is not whether these comments were inappropriate, the question is whether Attorney Nigrini's failure to object at the time and instead elected to request sidebar and discuss this issue with the judge warrants an ineffective assistance of counsel.

Despite refraining from objecting to the comments at issue made by the Prosecution during its closing, Defendant's trial counsel took extra steps to ensure a fair proceeding by requesting a sidebar prior to the reading of jury instructions. "Counsel are not constitutionally required to forward any and all possible objections at trial, and the decision of when to interrupt oftentimes is a function of overall defense strategy being brought to bear upon issues which arise unexpectedly at trial and require split-second decision making by counsel." *Commonwealth v. Spotz*, 870 A.2d 822, 832 (Pa. 2005). In protecting the interests of his client, trial counsel decided to request sidebar from the trial judge to address any potential confusion that could be caused as a result of the comments at issue.

It was reasonable trial strategy for trial counsel to address the issue at sidebar instead of objecting during closing argument. In some cases, it is reasonable for a trial attorney to make the determination that addressing a questionable remark in the form of an objection would be detrimental to the defense's case strategy. "Under some circumstances, trial counsel may forego objecting to an objectionable remark or seeking a cautionary instruction on a particular point

17

because objections highlight the issue for the jury, and curative instructions always do." *Commonwealth v. Koehler*, 36 A.3d 121, 146 (Pa. 2012).

In this case, the inconsistencies between the Defendant's testimony and the video tape evidence captured by his wife, and his remarks which tended to place blame for the animosity between Defendant's family and Victim's could have been made more pronounced to the jury if he were to have objected during closing. Instead, he felt that addressing the instruction the Court planned to read to the jury to potentially avoid highlighting these perceived weaknesses in his case while also ensuring the jury was informed of the Defense's lack of any burden to call witnesses to testify on its behalf was more appropriate and more aligned with Defendant's interests.

> During the evidentiary hearing, trial counsel explained his reasoning:
>
> I lodged that at – prior to instructions to the jury, we went over to the sidebar. I brought that to the Court's attention and I wanted to make sure it was crystal clear that we had no burden of calling any witnesses, including his wife. The Judge suggested that is part of his standard charge and he would make sure that would be addressed.

(N.T. Evidentiary Hearing at 13).

> This reasoning is in line with the trial record which supports this testimony.

> [Trial Counsel]: Your Honor, may we briefly see you at sidebar before instructions?
>
> [The Court]: You may.
>
> [Trial Counsel]: Your honor, I'm sure your instruction on burden of proof talks about the Petitioner bears no burden to present any evidence or call any witnesses, just in light of Ms. Hess's-
>
> [The Court]: Oh sure. Yes. Have I give you the standard?

18

[Trial Counsel]: All we have are the elements and the other –

[The Court]: No, no. I will give it to you.

[Trial Counsel]: I trust your honor.

[The Court]: No, no. I thought I had given it to you before, but just so you know. Here is mine. I have been reading this for 22 years.

[Trial Counsel]: That's okay. That's no problem.

(N.T.T. Vol. III, at 39). After this exchange, the Court instructed the jury as following regarding the Defendant's burden to call witnesses on his own behalf:

> Let's talk first about the presumption of innocence. A fundamental principle of our system of criminal law is that the Petitioner is presumed to be innocent... Furthermore, the Petitioner is presumed to remain innocent throughout the trial unless and until you conclude, based upon careful impartial consideration of the evidence, the Commonwealth has proven him guilty beyond a reasonable doubt of the charges made against him. It is not the Petitioner's burden to prove he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crimes charged and that the Petitioner is guilty of those crimes beyond a reasonable doubt. A person accused of a crime is not required to present evidence or prove anything in his own defense. If the evidence presented fails to meet the Commonwealth's burden, then your verdict must not be guilty.

(N.T.T., Vol. III, at 42-43.)

These instructions given by the Court eliminated the risk of prejudice that could have resulted from the Commonwealth's comments made in closing. Also, it avoided calling the jury's attention to a fact that was a major issue with the Defense's case. Attorney Nigrini made the judgment call to address the matter in a reasonable manner that was in the best interest of his client while also making sure that any prejudice that could have resulted was eliminated.

19

Given these actions and reasoning of Attorney Nigrini, it appears that Defendant was not prejudiced by trial counsel's failure to object to the Commonwealth's statement. The decision to refrain from objecting during closing was reasonable because there was a clear strategic reason for doing so and trial counsel was not required by Pennsylvania rules to make the objection.

### 3. Failure to call known witnesses

The next issue raised by Defendant involves the failure of Trial Counsel to call witnesses on Defendant's behalf. Defendant specifically refers to his wife and children and claims that failing to call them to the witness stand established ineffective assistance of counsel.

"When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisifies the performance and prejudice requirements of the *Strickland* test by establishing that: "(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the Petitioner a fair trial." *Commonwealth v. Sneed*, 45 A.3d 1096, 1108-09 (Pa. 2012). In order to establish prejudice, the petitioner must show that testimony of the uncalled witness or witnesses would have been beneficial given to circumstances of the case. *Commonwealth v. Gibson*, 951 A2d 1110, 1134 (Pa. 2008). If such testimony cannot be proven to have some potential benefit to the defense, then there is no valid claim that trial counsel was ineffective. Additionally, even though

20

an uncalled witness could have offered testimony that would be beneficial, if there is sound reasoning behind the decision that was influenced by certain trial tactics, then counsel's action will still not amount to ineffective assistance.

In the case at hand, the failure to call Mrs. Levengood and the children to the witness stand did not amount to ineffective assistance of counsel. At the evidentiary hearing, Attorney Nigrini first addressed the decision to refrain from calling Defendant's children from testifying. He explained that after discussions with Defendant and Mrs. Levengood, it was determined that refraining from making the children testify was in their best interests. Asking them to testify would have subjected Defendant's children to cross-examination by the Commonwealth. This could have been a potentially traumatizing experience for them and that refraining from calling them was clearly in their best interest.

Moreover, Attorney Nigrini explained that trial strategy also played into this decision. The children did witness the events that transpired on June 27, 2016. However, their observations would have likely been the same or substantially similar to those which were caught on video. Defense counsel determined that any testimony that the children could provide would not be useful since the interaction with Defendant and Victim was already caught on camera. Moreover, Attorney Nigrini explained that he was fearful that their testimony could even be potentially damaging to the Defense's theory. If Defendant's children were to provide testimony that was inconsistent with the video of the incident, it could have been damaging to the Defense's theory of the case. In light of the video evidence, any further

21

testimony from Defendant's children would likely lack any persuasive value. Given these facts, Defense Counsel's decision to refrain from calling Defendant's children to testify was reasonable and did not amount to ineffective assistance of counsel.

With respect to Defendant's wife, Defense Counsel had a reasonable basis for not calling her to testify too. While preparing for trial, Attorney Nigrini interviewed Defendant and his wife. As part of this interview, Attorney Nigrini asked both parties to give their versions of the events. Attorney Nigrini noted during these meetings that Mrs. Levengood would become extremely hostile when questioned about the specifics of her proposed testimony. Additionally, Mrs. Levengood's recounting of events differed from Defendant's. Given these facts, Attorney Nigrini felt that calling Mrs. Levengood to the witness stand and subjecting her to cross-examination would be potentially damaging to the Defense's case. Taken together, there is clearly a reasonable basis for making the decision to not call Mrs. Levengood to testify and therefore did not arise to the level required to establish ineffective assistance of counsel.

### 4. Failure to object to use of uniformed investigating officer as rebuttal character witness

Lastly, Defendant claims that trial counsel was ineffective for failing to object to the Commonwealth's use of a uniformed police officer as a rebuttal witness. Specifically, Defendant takes issue with the Commonwealth's rebuttal witness testifying in uniform despite not testifying in his capacity as a police officer. Additionally, Defense alleges that the rebuttal witness improperly suggested that

22

Defendant was involved in some illegal or criminal activity. Each of these concerns is addressed herein:

**a. Defendant was not prejudiced by Officer McCarrick offering rebuttal testimony while still dressed in uniform.**

Defense Counsel started the presentation of its case by offering the testimony of 21 character witnesses. These witnesses testified that Defendant's reputation in the community was one of a peaceful and law-abiding person. To avoid cumulative testimony, the trial court decided after the fourth character witness to have the addition 17 character witnesses stand before the jury to indicate they were planning to testify similarly.

On rebuttal, the Commonwealth recalled Officer McCarrick to the stand. Officer McCarrick had testified earlier in the day in the capacity of a law enforcement officer since he was the first responding officer to the scene. Officer McCarrick was in uniform when he testified earlier in the day, and remained in uniform when he testified again as a rebuttal witness. Trial Counsel did not object to Officer McCarrick wearing his uniform during rebuttal testimony.

When Mr. McCarrick came to the stand as a rebuttal witness, the Commonwealth took steps to explain that Mr. McCarrick was no longer testifying as a police officer and was now testifying as a civilian witness.

> ADA: Now sir, your official occupation as the jury learned this morning was a police officer; is that fair?
> Witness: That is fair.

23

ADA: You are here currently though as a citizen of Cornwall Borough as a civilian witness; is that accurate?

Witness: That is accurate.

ADA: But you're still technically on duty?

Witness: Yes.

ADA: Hence the uniform, the badge and all that?

Witness: Correct.

The Commonwealth then continued to question the witness regarding his residency in Cornwall Borough and that he knew of Defendant from living in the community.

There were clear steps taken by the Commonwealth to ensure that the jury was aware Mr. McCarrick was no longer testifying as a police officer and was now testifying in his capacity as a citizen of Cornwall Borough. Even though Mr. McCarrick did testify in uniform, it was clear that he was no longer testifying as a police officer. Defendant was not prejudiced by the fact that Mr. McCarrick offered this rebuttal testimony while still in uniform. Even if Mr. McCarrick had changed out of his police uniform and into street clothes, the jury would still have known he was a police officer because he had testified earlier in the day while he was in uniform. The fact that he remained in uniform without changing coupled with the Commonwealth's direct examination which elicited responses to show that Mr. McCarrick was no longer testifying as a police officer established that Defendant suffered no prejudice as a result of Mr. McCarrick offering testimony as a rebuttal witness while in uniform.

**b. Witness's mentioning of prior events.**

Defendant next claims that trial counsel elicited testimony from the rebuttal witness that should have been objected to. The exchange at issue is presented below:

Trial counsel: Violent nature?

Witness: Yes

Trial Counsel: Can you name one individual that provided you this information that gave you the basis of this reputation evidence?

****

Witness: There has been discussion amongst-

Trial Counsel: One name. One name. Provide me with one name.

Witness: I'm kind of reluctant to do that.

****

Witness: To answer the question needs more basis to –

Trial Counsel: Well, you just said that you have spoken with a number of people in the community about an individual's reputation for being violent and non-peaceful. I'm asking for one name that provided you with this insight, that gave him that reputation, one name.

Witness: I can tell you I've spoken with the Tribiolis that are out there. We'll (sic) see, I have discussed with Mike Tribioli issues in regards to this matter. This goes into the election process that took place here. People came to me, I was not at liberty because of the pending case, as to people wanting to see an outcome because of his action and his behavior as we know the election was also run.

Trial Counsel: You're talking about an individual that was a candidate running against Mr. Levengood; is that correct?

Witness: Oh, no.

Trial Counsel: Mr. Tribioli ran against-

Witness: Incorrect, Attorney.

25

Trial Counsel: But it was in reference to a sitting councilman, correct?

Witness: I am not understanding the question.

Trial Counsel: This person that came forward about this reputation for being violent?

Witness: That person I just mentioned.

Trial Counsel: The current election that just took place, is that correct?

Witness: Can I answer the question?

Trial Counsel: Yes or no?

Witness: You're asking me the person. I'm saying is (sic) that the person that ran against him: No. That is not the person that ran against him.

Trial Counsel: You mentioned these were individuals relative to his position at Borough Council. The crux of this concern that was sitting councilman charged with-

Witness: Personally with me. Memorial day parade one year ago, am I permitted to discuss that?

At this point both attorneys were called to a sidebar with the presiding judge. At its conclusion, trial counsel indicated that he had no further questions for the witness.

After a plain reading of this exchange, there appears to be no instance in which the witness stated he knew of other crimes or illegal acts committed by Defendant for which he had not been convicted. In fact, it borders on incompetency. However, this line of questioning was a reasonable strategy because it was an attempt to question the witness about his knowledge of Defendant's reputation in the community. Moreover, Trial Counsel was not ineffective for failing to object to this portion of witness's testimony. Although Defendant alleges that he was prejudiced by the witness's answer, this Court does not see that to be the case. The exchange between Trial Counsel and the witness became nonsensical and the trial

judge requested a sidebar before the line of questioning became too far off track. There was no clear indication that the witness was suggesting that Defendant had engaged in any other illegal or criminal behavior and therefore Defendant suffered no prejudice. As a result, trial counsel was not ineffective for failing to object.